408 A.2d 872

### In the Interest of Tamela PERNISHEK, a Minor Born 11–3–69, an Alleged Dependent Child.

### APPEAL of William A. PERNISHEK et ux.

Superior Court of Pennsylvania.

Argued April 10, 1979.

Filed Aug. 8, 1979.

448

Marla R. Blum, Greensburg, for appellants.

Donald J. Snyder, Jr., Greensburg, for appellee.

James L. Liberto, New Kensington, for Westmoreland County Children's Bureau, participating party.

Before CERCONE, President Judge, WIEAND and HOFFMAN, JJ.

HOFFMAN, Judge:

Appellants are the natural parents of Tamela, a young child diagnosed a psychosocial dwarf. They contend that the lower court erred in: (1) declaring Tamela a "dependent child" under the Juvenile Act [1] and (2) ordering her placement in a home for crippled children until she attains a certain height. We affirm with modifications and remand with directions for further proceedings.

On August 8, 1978, the Westmoreland County Children's Bureau filed a petition alleging that Tamela, born November 3, 1969, was currently in a foster home and that two

[1]. Act of July 9, 1976, P.L. 586, No. 142, § 2; 42 Pa.C.S.A. § 6301 et seq.

doctors had recommended that she return to her natural parents on a trial basis. On October 27, 1978, the lower court held a hearing on the petition at which Tamela and appellants were represented by separate counsel. The testimony adduced at the hearing may be summarized as follows:

Ms. Karen Kempert, Tamela's caseworker from the Children's Bureau, testified that sometime prior to November 1972, Tamela was hospitalized and found to be very small for her age and malnourished, with abnormal affect, an enlarged liver, and battered child syndrome. She was then placed in a foster home until November 1972. From November 1972 to January 1976, Tamela lived with her natural family. On January 13, 1976, Tamela entered a hospital where a Dr. Zeidner diagnosed her a psychosocial dwarf. At that time she behaved abnormally and was undersized and malnourished, with an enlarged liver and high blood cholesterol level. On January 16, 1976, the Children's Bureau obtained emergency custody of Tamela. On March 5, 1976, Tamela was discharged from the hospital and placed in a foster home. Approximately one week later, the Children's Bureau transferred her to another foster home where she continued to reside up to October 27, 1978, the day of the hearing. On May 8, 1976, appellants consented to the Children's Bureau's custody of Tamela. Appellants visited Tamela twice in September and October 1976 under Bureau supervision, at which time Tamela began to eat compulsively. Appellants stopped their visits and did not resume them until September 1977 upon the recommendation of Dr. Maria Von Mickwitz. By March 1978, Tamela was visiting with appellants overnight once a month and, by July 1978, twice a month. Tamela exhibited no adverse effects as a result of the visits. In fact, while she grew 1¼" during an 11 month period without parental visits, she grew 2¼" during the subsequent 11 month period with parental visits. Tamela did not grow during the two months immediately prior to the October 27, 1978 hearing; Kempert testified that Tamela was having problems both at the foster home and at school. Kempert further testified that appellants had volun-

tarily entered family therapy in January 1978 and had always been very cooperative.

Dr. Dorothy Becker, a pediatrician and endocrinologist with a special expertise in psychosocial dwarfism, next testified. According to Dr. Becker, psychosocial dwarfism is a relatively new diagnosis first identified in 1963 when children presented "what looked like clinical and chemical growth deficiency. These children were tested, were going to be put onto growth hormones and while awaiting therapy in a convalescent home were found to grow faster than any normal child, and it was later confirmed that children with certain specific history, family history, and certain specific physical features fitted this diagnosis which goes by a number of different names [including emotional deprivation].[2] These children have been found to have poor growth physically, and . . . mentally in their own home environment, and when they are removed from this home environment have spontaneous improvement in both physical, mental, and emotional development without any intervention medically, frequently without any psychological intervention. . . . [T]hese children seem to react to their environmental situation which is not necessarily one of deprivation. There is still not a consensus of opinion in the medical world . . . whether this syndrome is related to malnutrition. . . . " Dr. Becker testified that excessive stress on the children appears to cause certain biochemical changes, one of which is that the growth hormone "just switches off." Another classical feature of the syndrome is an abnormally high fat content in the blood. Dr. Becker agreed that a diagnosis of psychosocial dwarfism necessarily means that the home environment is unsatisfactory to the child and not adequate for the child's proper care.

Dr. Becker testified that in order to attain "anything near normal growth," either mental or physical, a child must grow faster than normal until he attains at least the mini-

2. *See, e. g.*, Powell, Brasel, and Blizzard, "Emotional Deprivation and Growth Retardation Simulating Idiopathic Hypopituitarism," 276 *New Eng.J.Med.* 1271 (1967).

mum limit for normal. This faster growth is called "catch up growth." In her study of 35 children diagnosed psychosocial dwarves, Dr. Becker found that only 1 of the 35 attained any degree of catch up growth while in his own home. Of the remaining 34 children, none achieved or maintained catch up growth in the natural home despite psychological and psychiatric intervention. When placed in a foster home or similar setting, 5 children achieved catch up physical growth, and "most" experienced catch up mental growth. While all the children in the study under 10 years old caught up in growth, not all those over 10 years old did. When they reached the lowest limit of normal height for their age, the children returned to their natural home. There they maintained only normal growth despite psychological and other intervention.

Dr. Becker first saw Tamela sometime in 1976, twice again in the next 2½ years, and most recently in August 1978. She has never seen appellants or Tamela's two brothers, nor has she ever read any psychological or psychiatric assessment of appellants. Dr. Becker testified, however, that she had reviewed data from Tamela's social worker, psychiatrist, and Dr. Zeidner. On the basis of the foregoing, she provided the following history and analysis:

In January 1976, when Tamela entered the hospital, she was 6 years 2 months old. Her "height age", however, was only 2 years 1 month (34" or 88 centimeters), and her mental age was only 4 years 9 months. She showed signs of malnutrition, with thinning bones, light bruises and possible burn marks on her legs, and no measurable growth hormone. During the 2 months that she was in the hospital, she grew 1¼", or three times faster than a normal child would grow in the same period. When appellants visited her in the hospital, her blood cholesterol level increased. When she left the hospital her growth hormone measured borderline normal. During the first and second four month periods [3] of

---

**3.** Although we calculate that the first 8 months of foster care ended in November 1976, Dr. Becker stated that the last measurement, in

foster home placement, Tamela grew 5.5 and 3.0 centimeters, respectively; both growths were above normal. When Tamela was 7 years 4 months old, she was only 98 centimeters tall, and her growth rate had dropped off to a rate of 5 centimeters per year (slightly below normal).[4] Dr. Becker noted that during this period, appellants had visited with Tamela once or twice and Tamela had started psychotherapy. Dr. Becker did not see Tamela from September 1976 to September 1977 and did not know exactly when the parental visits occurred. Measurements taken in September 1976, May 1977, and August 1978 revealed that Tamela was growing at a yearly rate of approximately 5 centimeters.[5] As of August 1978, Tamela was 8 years 9 months old, with a height age of 4 years 2 months.

On the basis of the foregoing, Dr. Becker concluded that Tamela was a psychosocial dwarf and recommended that she be removed from her current foster home to either a new foster home or the Home for Crippled Children, a nearby institution where a team of psychologists, psychiatrists and growth specialists could carefully monitor her development. She also recommended that parental visits continue. Dr. Becker could not state the likelihood of Tamela's catch up growth in such setting. However, based upon her experience and review of Tamela's records, she believed that Tamela's attaining catch up growth in her natural home was very unlikely. The likelihood that Tamela would maintain normal growth at home was, on the other hand, very good.

which Tamela showed 3.0 centimeters of growth, was made in September 1976.

4. According to Dr. Becker, a growth rate of 6 centimeters per year is normal.

5. This constant rate of growth appears to contradict Kempert's and Dr. Von Mickwitz's testimony that Tamela grew 1¼″ during 11 months without parental visits and 2¼″ during the subsequent 11 months with parental visits. Dr. Becker explained that the measurements were so sensitive that they should be made by the same specialist each time to ensure reliability; that procedure was not followed. Moreover, no one claims that the alleged faster rate of growth during parental visits amounted to catch up growth. *See* text *infra.*

She further stated that the older Tamela becomes, the more difficult it will be for her to catch up.[6] Without catch up growth, she will not develop normally and will remain a dwarf. Dr. Becker believed that when Tamela reached the lowest limit of normal for height she could return to her natural home with continuing therapy for both her and her family. Moreover, Dr. Becker believed that even if certain stressful factors in Tamela's home were no longer present, placing her in a new environment would be less risky than returning her home at this time. The change in blood fat levels when her parents visited her in the hospital in 1976 suggested that Tamela experienced stress, but Dr. Becker could not categorically state the source of stress.

Dr. Maria Von Mickwitz, a clinical psychologist at Latrobe Mental Health center, next testified. She and a child psychiatrist have treated Tamela and her family since July 1977. She confirmed Kempert's testimony that Tamela grew 1¼″ from fall 1976 to 1977 when parent-appellants never visited and 2¼″ in the same period of time after fall 1977 when they visited her approximately twice a month. Less than one week prior to the hearing, Dr. Von Mickwitz tested Tamela, using the Wexsler Intelligence Test, the 1974 revision of the Bender Motorgestalt Test and a wide range achievement test. She concluded that Tamela had an overall intellectual level at the "low end of the average range," with considerable variability which suggested that she might have the potential for doing better. Tamela also had mild vision motor problems. All her achievements in reading, word recognition, spelling, and arithmetic were at the mid second grade level, "which [was] a couple months ahead of where she should be." Based on her treatment of Tamela's entire family, Dr. Von Mickwitz concluded that the interaction between spouses, parents and children, and siblings was "exceptionally good": all members of the family were very supportive and sensitive of each other's needs. Both Tamela

6. This is so not only because of the results in Dr. Becker's case studies but also because tests showed that Tamela's "bone age" was 1 year ahead of her "height age" and, accordingly, she has 1 year less potential growth available.

and her family had expressed definite desires that Tamela return home. Dr. Von Mickwitz agreed generally with Dr. Becker's diagnosis that Tamela was a psychosocial dwarf and that the current foster home was not good for her. However, she recommended that Tamela return to her natural home and that family therapy and monitoring continue. Certain stresses present in the parental home in 1976 when Tamela was hospitalized were no longer present. As a result, Dr. Von Mickwitz felt "we have a chance of working things out with the child in the family." Moreover, she felt that Tamela would experience more stress initially in a new environment than in the parental home. She candidly admitted that she had little experience with psychosocial dwarfism and could only "guess wildly" that Tamela would achieve catch up growth if placed with appellants.

Finally, appellants testified. Ms. Pernishek testified that when Tamela was hospitalized in 1976, her oldest son, then age 7 years, had just undergone open heart surgery, her husband was ill and unemployed, and her mother had "mental problems" as a result of a stroke. All these stressful family events had been resolved by the time of the hearing. She confirmed that she and her husband had voluntarily consented to transfer Tamela's custody to the Children's Bureau in 1976. She wished to have Tamela returned home because "that is where she belongs." She testified that she was quite willing to continue family therapy. Mr. Pernishek agreed with his wife's testimony.

After hearing the above testimony, the lower court entered the following order:

"AND NOW, to wit, this 27th day of October, 1978, after a full hearing in the within Petition of the Children's Bureau the Court makes the following Findings of Fact, Conclusions of Law and Order.

## FINDINGS OF FACT

"1. Tamela Pernishek is the natural child of William and Sandra Pernishek, . . .

"2. That Rabe F. Marsh, III, Esq. was appointed Guardian ad litem for Tamela Pernishek . . . on January 27, 1976.

"3. That on May 19, 1976, the Westmoreland County Children's Bureau was awarded custody of Tamela Pernishek after hearing in the matter and or a voluntary placement by the parents.

"4. That the professional testimony indicated that this case by both professionals is that the child, Tamela Pernishek, is a psychosocial dwarf.

"5. That there is suspected voluntary child abuse according to the records.

"6. That the natural parents' present home is not the optimum invironment [sic] for the proper care of the child, Tamela Pernishek.

"7. That the child grows physically when the child is not with the natural parents.

## CONCLUSIONS OF LAW

"1. That this Court has jurisdiction.

"2. That the child is declared a dependent child for the reason that the child is without proper involuntary parental subsistence which is detrimental to the child's welfare.

"3. It is clearly necessary for the child's health that the child be removed from the home and to allow the child to have the opportunity for a normal catch up growth period in her development.

"4. It is clearly necessary that the child is in need of medical attention in treating the abnormality that this child apparently has.

## ORDER OF COURT

"AND NOW, to wit, this 27th day of October, 1978, the custody of Tamela Pernishek, is to be continued in the Westmoreland County Children's Bureau with the direction that the child be removed immediately from the foster home

where she presently resides, and placed in the home for crippled children until this child reaches that limit of height for the child of her age, or until she attains the physical average height for a child of her age. It is FURTHER direction of this Court that the child every three months should be seen by the endocrinologist at Children's Hospital.

"IT is the direction of this Court that until further Order of this Court the parents are to visit this child not less than two times a month. It is FURTHER direction of this Court that Rabe F. March, III, shall continue to serve as Guardian ad litem for Tamela Pernishek until further Order of this Court." The lower court did not file an opinion in support of its order.

■■■ In order to preserve family unity "whenever possible," the Juvenile Act provides that our courts: (1) may not find a child dependent" absent clear and convincing evidence and (2) after making such a finding, may not separate the dependent child from his parents unless such separation is clearly necessary. 42 Pa.C.S.A. §§ 6301(b)(1) and (3) and 6341(c). See In re Whittle, 263 Pa.Super. 312, 397 A.2d 1225 (1979); In re Clouse, 244 Pa.Super. 396, 368 A.2d 780 (1976). To ensure a proper resolution of these issues, separate counsel should represent the child at the dependency hearing, and the hearing judge should conduct a comprehensive inquiry by receiving evidence from both interested and disinterested witnesses and should support his decision in an opinion in which he discusses and analyzes the evidence fully. In re Hernandez, 249 Pa.Super. 274, 376 A.2d 648 (1977); In re Clouse, supra; In re La Rue, 244 Pa.Super. 218, 366 A.2d 1271 (1976); Stapleton v. Dauphin County Child Care Service, 228 Pa.Super. 371, 324 A.2d 562 (1974); Commonwealth ex rel. Grillo v. Shuster, 226 Pa.Super. 229, 312 A.2d 58 (1973). In the instant case, the hearing judge did not file an opinion in support of his decision and provided only seven short findings of fact. Ordinarily, we would remand to the lower court for filing of a full opinion. See Martincheck v. Martincheck, 262 Pa.Super. 346, 396 A.2d 788 (1979); Commonwealth ex rel. King v. Davis, 261 Pa.Super.

423, 395 A.2d 977 (1978). However, we believe that the better procedure in the instant case is to reach the merits. The record is sufficiently complete for us to do so, and further delays in properly adjudicating the case can only adversely affect Tamela and appellants. *In re Whittle, supra; In re Hernandez, supra.*

The Juvenile Act defines a "dependent child", in relevant part, as a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302. By restricting dependency to the lack of "care or control *necessary* [to a child's] . . . health . . ." the Act limits the Commonwealth's coercive interference with the family unit to those cases where the parents have not provided "a minimum standard of care for a child's physical, intellectual and moral well being." *In re Rinker*, 180 Pa.Super. 143, 148, 117 A.2d 780, 783 (1955), cited with approval in *In re DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976). Thus, in determining whether a child is dependent, the hearing judge should not ask what are the child's "best interests" but whether the child is presently without proper parental care and, if so, whether such care is immediately available. *See In re La Rue, supra.* By "proper care" we mean care suited to the child's particular needs. Thus parents may be able to care for a normal child but not one who has special needs. *See In re Whittle, supra* (burns required special therapy which mother was unable to provide); *In re Rinker, supra* (child below average mentally may require more care than a normal child). Accordingly, parental care which is both "necessary" and "proper" is not the best care possible but that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child. *See e. g. In re Sharpe*, 248 Pa.Super. 74, 374 A.2d 1323 (1977) (severe chemical dermatitis, undermineralization, abrasions, evidence of bone fractures, and stunted social and verbal development from social deprivation are sufficient to find deprivation);

*In re De Savage, supra* (conjectural possibility of neglect is insufficient to support a finding of deprivation).

■ In the instant case, the evidence is undisputed that Tamela is a psychosocial dwarf and that without catch up growth she will remain a dwarf. Moreover, at the time of the dependency hearing her dwarfism was still severe. Only two or three months before the hearing, Tamela was 8 years 9 months old but had a height age of only 4 years 2 months; her mental age more closely approximated her chronological age. Therefore, without proper care, *i. e.*, care which promotes catch up growth, Tamela will suffer at a minimum serious and permanent physical injury. Her parents can, with medical and psychiatric intervention, provide Tamela sufficient care at home for her to maintain normal growth. Such care is insufficient, however, to prevent serious and permanent dwarfism. Based upon Tamela's history and her own expertise in psychosocial dwarfism, Dr. Becker believed that appellants were very unlikely to provide a home environment suitable for catch up growth, even with intervention. Dr. Von Mickwitz, who favored home placement, admitted that she could only "wildly guess" that Tamela would achieve catch up growth at home. Tamela's undisputed medical history more than adequately supports Dr. Becker's opinion. Prior to 1976, Tamela's mental and physical growth was obviously abnormally low. She exhibited all the classic symptoms and responses of a psychosocial dwarf. She has caught up in growth only when away from home. While maintenance of normal growth with parental visits may augur well for continued visitation and may reasonably indicate that normal growth would continue if Tamela returned home, it does not suggest that she would catch up at home. We conclude, therefore, that the available evidence, including expert opinion, indicates clearly and convincingly that appellants are unable to provide Tamela the care necessary for catch up growth. Accordingly, we affirm the lower court's finding of dependency.

■ Appellants next contend that the lower court erred in separating Tamela from her home. In *In re Whittle, supra,*

263 Pa.Super. at 316, 397 A.2d at 1226, we stated that "[t]he purpose of the Juvenile Act is to preserve, whenever possible, the unity of the family; children should be separated from their families only in cases of clear necessity. . . . *In re La Rue [In Interest of La Rue]* , 244 Pa.Super. 218, 222–27, 366 A.2d 1271, 1273–1275 (1976). Even where there are inadequacies in the child's home, the court should first consider ordering [the Commonwealth] to take the steps necessary to instruct the parents in the skills needed, and provide follow-up supervision in the home, where feasible. *Matter of DeSavage, [supra ]*." However, even when the Commonwealth establishes by clear and convincing evidence that parents cannot provide the minimum standard of care and that some supervision is clearly necessary, *In re Whittle, supra,* it may be inappropriate for the court, in attempting "to provide for the . . . wholesome mental and physical development" of the dependent child, 42 Pa.C.S.A. § 6301(b)(1), to force its choice of additional treatment over the parents' choice when all available treatments are speculative and risky. Because one of the Juvenile Act's purposes is to preserve family unity, one of the risks which the court must weigh is the child's separation from his natural home. 42 Pa.C.S.A. § 6301(b)(1).

In the instant case, no evidence suggests that appellants, by themselves or with medical and psychiatric intervention, can care for Tamela in their home in such a way that catch up growth is even likely. Our difficulty lies, however, in determining on the present state of the record whether Tamela's chances of success at the Home for Crippled Children, *i. e.,* attaining and maintaining catch up growth until she reaches the minimum limit for normal, are so speculative that a case of clear necessity has not been made out.[7]

---

7. Under *In Interest of Whittle, supra,* we believe that ordering some supervision of Tamela in her natural home would be proper. Moreover, we have no difficulty in agreeing with the lower court that Tamela should be removed from her current foster home. The caseworker and both doctors agreed that Tamela's current foster home no longer met her needs. Although she exhibited catch up growth during her first eight months in the foster home, she grew at only a slightly below normal rate during the subsequent 22 months,

Dr. Becker believed that Tamela could attain catch up growth at the Home for Crippled Children where specialists familiar with psychosocial dwarfism could monitor her. She based this belief primarily upon Tamela's excellent catch up growth in 1976 when she was hospitalized. However, she could not state the likelihood of Tamela's successful treatment there, i. e., maintenance of catch up growth until minimum level for normal is reached. This is not surprising. Psychosocial dwarfism is a relatively new diagnosis. Dr. Becker admitted that the medical profession lacks consensus on the syndrome's relation to malnutrition and that many of the syndrome's mechanisms are unknown. More importantly, during the 2½ years prior to the hearing, no one monitored with adequate frequency and precision Tamela's development in the foster home or her interaction with her foster parents. Without a more extensive history of Tamela, Dr. Becker's opinions were bound to be cautious. However, from our review, we conclude that the evidence satisfied the "clear necessity" test for Tamela's immediate placement in the Home for Crippled Children on a trial basis. Her 1976 growth under similar circumstances has already been noted. In addition, at the time of the hearing, Tamela was still less than 10 years old, the age when, according to Dr. Becker's case studies, the chances of full catch up growth begin to decline.

However, the evidence is too speculative to establish a clear necessity for her *continued* placement in the Home for Crippled Children. Dr. Becker suggested that detailed measurements of Tamela be taken every three months, and the hearing judge incorporated her suggestion into his order. We conclude, however, that the complexity and severity of

and had apparently stopped growing during the one or two months immediately preceding the hearing. On the other hand, both doctors believe that Tamela would maintain normal growth if placed in appellants' home with supervision. They base their belief upon appellants' cooperation with therapists during the previous year, the absence of obviously stressful factors in the home, and the recent history of visitation with Tamela. Thus, placing Tamela in her natural home with supervision is clearly preferable to keeping her in her current foster home.

Tamela's condition, the need for frequent, precise, and current information on her development, and the uncertainty of successful treatment require more. Tamela has already been in the Commonwealth's custody for 2½ years, and for almost 2 of those years the Commonwealth's agents neither monitored her development adequately nor acted with any reasonable speed when her growth rate slipped from catch up to slightly below normal. Now, when time is running out for Tamela, the Commonwealth wants to place her, against both her and her family's wishes, where she should have been placed in the first instance. However, this placement, necessary as it now appears, may not work. If it does not, then Tamela should be returned to her family where, with continued careful supervision, she can grow at a normal rate. Accordingly, we remand with directions that every three months the lower court review Tamela's progress, if any, in a full hearing with all interested parties present and represented by counsel. Because considerable time has already elapsed since Tamela's placement in the Home for Crippled Children, the first of these hearings must be within 30 days of this opinion.

Affirmed with modifications and remanded with instructions.