**In the interest of: Frank Brand**

*John L. Walder*, for Mrs. Brand.
*Leonard J. D. Myers*, for Children and Youth Services.
*David Delpizzo*, for Frank Brand.
*Albert L. Chase*, for Children's Aid Society.

NICHOLAS, *J.*, March 3, 1981—The natural mother of Frank J. Brand, now almost 15 years old, has appealed to the Superior Court of Pennsylvania from the order of this court dated December 2, 1980, adjudicating Frank to be a dependent child, awarding custody to Children and Youth Services of Montgomery County and directing his continued placement in foster care in the home of Mr. and Mrs. Bryan Walker with whom he has continuously resided since 1972 when he was six years old.

The matter came before the court upon cross-petitions. The first, by Montgomery County Children and Youth Services, (hereinafter CYS), a petition for consideration of a dependent child (orally amended at the time of the hearing to specifically allege dependency,); and the petition of Ruth Brand Brown, Frank's natural mother, seeking to terminate voluntary placement and to have custody of Frank immediately returned to her.

An adjudication hearing was held before the undersigned as to both petitions on December 2, 1980, at the conclusion of which, the court found, by clear and convincing evidence, that Frank is a dependent child and that his continued placement with Mr. and Mrs. Walker was clearly necessary. The

court further directed, however, that visitation with the mother and step-father is to be expanded as much as feasible with schedules as agreed by counsel.

On December 29, 1980, Mrs. Brown (hereinafter appellant), filed a notice of appeal of our order of December 2, 1980. Pursuant to Pa.R.A.P. 1925(b), a statement of matters complained of was filed by appellant on January 20, 1981, asserting seven points of error. We shall deal with these and endeavor to comply with our responsibility to file a comprehensive opinion fully explaining our findings and conclusions as required by Valentino v. Valentino, 259 Pa. Super. 395, 393 A. 2d 885 (1978), and Pa.R.A.P. No. 1925(b).

The evidence adduced at the hearing, at which all parties, including Frank, were represented by counsel, established the following facts:

Frank John Brand, the subject of these proceedings, was born on March 22, 1966. On April 18, 1966, Mrs. Brown's father, Salvatore Mazzerle, referred the matter to CYS expressing concern of his daughter's living conditions and particularly the welfare of her infant son, Frank. At about the same time, CYS had received referrals from the Visiting Nurses Association to the effect that the mother had had no pre-natal care or knowledge of raising a child. The mother was and is of quite limited intelligence. Additional referrals were made to CYS by a Reverend Seaman of the Souderton Lutheran Church expressing the concern of the neighbors that Frank was underdeveloped, undernourished and receiving deplorable care. Visiting Nurses continued to attempt to provide services to the family with little cooperation.

Further referrals were made to CYS. In February, 1968, by a justice of the peace, when appellant

complained of being beaten by Mr. Brand, Frank's father, and being without money to buy food. In April, 1971, Mrs. Brown's brother, Robert Mazzerle, contacted CYS reporting that Frank had been dropped off at his home by an unknown man. At the time, Frank was described by his uncle as being thin with an enlarged stomach. Mr. Mazzerle advised that his sister was intellectually limited and was trying to dump the child so that she wouldn't have to take care of him.

In January, 1972, CYS received another referral regarding the mother by Family Services of Lansdale who had been working with the Brands since April, 1971. It was then reported that Mrs. Brand was extremely dependent upon Frank and that their relationship appeared emotionally infantile. Frank was described as a bed wetting child, given to violent temper tantrums.

Early in 1972, Mrs. Brown placed Frank with another family but advised Family Services of Lansdale that she couldn't remember with whom she had placed him. At about this time, Frank's father, Mr. Brand, was in extremely poor health. He was an elderly man, described as being senile, and was placed in the Charles Johnson Home, now known as the Montgomery County Geriatric Center. He died in October, 1974.

In April, 1972, Mrs. Brown contacted CYS. She reported that she was living a nomadic existence with no living arrangements or money, bouncing from place to place for shelter, with young Frank, begging for food. Several days later, on April 13, 1972, she signed a Voluntary Placement Agreement (C-1) and the child was placed by CYS with the Children's Aid Society under whose auspices Frank was eventually placed with Mr. and Mrs. Bryan Walker as foster parents. He has lived with the Walkers ever since July, 1972.

Following Frank's placement, Mrs. Brown obtained part-time work in a local restaurant and boarded with a family in Lansdale. In March, 1975, she moved to her present apartment in Souderton. She married Edward Brown on August 8, 1978. He is 49 years old. Mrs. Brown is now 52 years old. Both are unemployed. Mr. Brown receives Public Assistance in the amount of $192 per month and Mrs. Brown receives supplemental security income of $270 per month. Their monthly rent is $195. Both have physical disabilities. Mrs. Brown has not worked since 1974. She testified she had a bad injury, "when a great big table fell on my foot." Significantly, she added "that's why I want Frank John Brand to be with me and help me, go to the store for me, because that would be a good help for me, too." Mr. Brown testified that he had four ruptured discs and he too hasn't worked since 1974. Mr. Brown did impress me as being supportive of Mrs. Brown and having a genuine affection for Frank. They apparently get along well together, living rather modestly in their three room apartment, without an automobile or a telephone.

From the time Frank was placed in April of 1972, Mrs. Brown visited Frank once a month. The case record, as testified to by Jeff Landes, CYS caseworker, describes their interactions as emotionally immature. Mrs. Brown would seek Frank's approval and relate to him more as a peer than as a parent/child relationship. These visits continued until January, 1976, when the Walkers relocated to Kingston, Tennessee with Frank. Mrs. Brown was very upset with this development and refused any contact with her Children's Aid Society caseworker for a period of six months. Unfortunately and inexcusably, CYS maintained no further contact with Mrs. Brown until 1978, when Mr. Landes was assigned to the case. Up to this point, Mrs. Brown

would have visits from Frank three times a year but only for a day and not overnight. A new visitation schedule was arranged providing for thrice yearly extended overnight visits between Frank and his mother and step-father. The first such visit was for five days at Christmas, 1979. Subsequent visits were had in February, 1980, at Easter vacation, 1980, and in August, 1980. It was at the end of the last visit that Mrs. Brown expressed her determination to have Frank returned to her permanently. Shortly thereafter, the instant cross-petitions were filed.

Since his placement with the Walkers, Frank has developed into a sensitive boy of superior intelligence. Both Mrs. Walker and Carol Lester, the Children's Aid Society caseworker, testified, however, that Frank continues to require firm, structured and parental control which he was unlikely to receive from the Browns. Frank himself said as much during the court's chambers colloquy with him. He said: "I was telling her (Mrs. Brown) about all the restrictions and everything I have with the Walkers and she said, she told me that, you know, I could do what I wanted to as long as I could be happy and nothing really mattered to her, that she just wanted me to be happy." Frank desperately wants to remain with the Walkers. He wrote a most poignant letter to his mother before the hearing imploring her not to go through with the court action to compel him to return to her. He reiterated his feelings during our chambers colloquy stating, "It probably would change my whole life. I just wouldn't be the same."

Frank lives with the Walkers on a 42 acre farm in Kingston, Tennessee. Mr. Bryan Walker has a PhD in Physics and is the Manager of the Department of Energy in Oak Ridge, Tennessee. Mrs. Laura

Walker is a homemaker. All three of the Walker children are now grown and out of the house, leaving only Frank at home. Frank is involved in school band, church activities, farm and mechanics. Mr. and Mrs. Walker deeply impressed the court as exemplary foster-parents who have, by their love and guidance, allowed Frank to develop into a fine young man. Particularly impressive was the sensitivity which the Walkers and Frank demonstrated to Mrs. Brown's present position. Unfortunately by reason of her limited intelligence, volative temperament and her own lack of sensitivity, Mrs. Brown, for her part, totally rejects the Walkers very positive role in Frank's life.

Carol Lester, the Children's Aid Society Caseworker who has had this case since 1974, testified that in her opinion, Frank is a dependent child within the definition of the Juvenile Act in that Mrs. Brown is incapable of providing him with proper parental care or control necessary for his emotional health or morals. She described Mrs. Brown as doing much better now than she had been before but she is still on a level of just being able to deal with her own problems. Her limited intellect and emotional instability prevent her from assuming the proper parental role and discharging the high duty she owes Frank as his mother. This has been evident from the time of his birth down through the present. As an example, Mrs. Brown's reaction to the letter Frank wrote her, was to refuse to speak to him on the telephone to discuss the matter.

Mrs. Walker testified that Frank told her, when she asked how he'd feel if he went back to live with his mother and stepfather; "I'd be angry. I'd just wouldn't do it."

Given the fact that Frank is so emphatic in his desire to remain with the Walkers, it takes little

imagination to project the emotional turmoil which would ensue and the total inability of Mrs. Brown even as aided by her husband, to deal with it and render proper parental care and control, suited to Frank's "particular needs." In the Interest of Pernishek, 268 Pa. Super. 447, 408 A. 2d 872, 878 (1979).

The evidence plainly reveals that Frank loves his mother and feels responsible for her. He is terribly conflicted between his understanding that she cannot meet his needs and his desire to be with her so that she is not unhappy. In short, Frank understands what is clear, that Mrs. Brown needs Frank emotionally more than he needs her and that she cannot presently meet his parental needs particularly the acute problems which would surely surface by uprooting Frank.

A finding of dependency may be made on the basis of such "prognostic evidence." Matter of De-Savage, 241 Pa. Super. 174, 360 A. 2d 237 (1976); In the Interest of LaRue, 244 Pa. Super. 218, 366 A. 2d 1271 (1976).

The issue the court is called upon to decide is "one of the most difficult problems in the law." In the Interest of LaRue, 244 Pa. Super. 218, 366 A. 2d 1271 (1976); In re Custody of Frank, 283 Pa. Super. 229, 423 A. 2d 1229 (1980).

LaRue, supra, is clearly the most comprehensive exposition of the manner in which the hearing judge must approach this difficult task.

We understand of course, initially, that where, as here, the court is called upon, by virtue of the petition brought by CYS to have Frank declared "dependent," the Commonwealth acting through CYS must carry its burden of proof by "clear and convincing" evidence. 42 Pa.C.S.A. §6341(c).

The Juvenile Act, 42 Pa.C.S.A. §6302 defines a "dependent child" as a child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals . . . "

As indicated by our findings of fact earlier, the court was satisfied that the evidence clearly and convincingly establishes that Frank J. Brand is a "dependent child." At the conclusion of the hearing, the court announced its findings and conclusions, in accordance with 42 Pa.C.S.A. §6341(a), as follows:

"THE COURT: Well, this is a most troublesome and difficult case as all counsel have argued, and as the LaRue case highlights, when entrustment agreements of this sort are entered into and years pass and children are placed in foster care and that goes on for a time, obviously roots are established, and it becomes difficult to undo it. As the Court points out, it is said sometimes that time heals, but time can also wound, and I have to comment that just as in LaRue as the Court found in that case, there really was no effort to reunite Frank with his mother. That's just the way it was. It's unfortunate that it came to pass in that way, but the Court has to deal with the present reality.

"In the LaRue case the Court pointed out that in determining the issue of dependency—well, we recognize the primacy of the family and the importance of maintaining a child in the natural surrounding of his own biological family—the concern must be whether or not that family can provide the high duty that parenting imposes towards children, and in that sense, the Court points out that the question is really is proper parental control immediately available if young Frank was returned to the custody of his mother, and on that score I have to conclude from the evidence presented by clear

and convincing evidence that Frank is a dependent child.

"I make this finding without any real difficulty in the sense that I'm convinced by clear and convincing evidence that Mrs. Brown by virtue of her own unfortunate shortcomings misconceives the nature of the parental duty. As I see it, while she loves Frank and wants him desperately to return to her, I think she's motivated primarily—and I might say inappropriately—by having him return to her so that it may fulfill some void in her own life rather than to provide him with what he needs in the way of emotional, educational stability as defined in the Juvenile Court Act in the definition of dependency.

"I make that determination from the content of her testimony and from the way in which it was offered. I listened to her very carefully, and from the content of her testimony and her demeanor on the stand, I conclude that she does misconceive the nature of the parental role, and for that reason, I am compelled to conclude that the evidence is clear and convincing that Frank is a dependent child.

"What I find disturbing, as Mr. DelPizzo pointed out, is her repeated reference to the fact that Frank belongs to her. Well, I can understand that. I think it goes beyond the expression of one who is not perhaps as educated as others may be, but it goes beyond that. I think in a real sense it reveals her rather possessive attitude, which is inappropriate, and I think does not indicate her preparedness to undertake the parental role at this point in Frank's life.

"Having found that he's a dependent child, I then must address the issue of an appropriation disposition. The Court recognizes that the task is not completed when we find the child is a dependent child. In order to remove the child or at least continue the

child in the custody outside of the mother's home, the Court has to be satisfied by proof of the, quote, clear necessity, close quote, to continue to separate the child from his natural mother. And in that regard, I find that such factors do exist to convince me of the clear necessity of maintaining Frank in his present surroundings with Mr. and Mrs. Walker. The child has been in that home since the age of six. And while I reiterate the Court's regret with the events which precluded a more closer contact with his natural mother, the move and so forth, the fact remains that since the age of six that child has known but one home and that is the home of Mr. and Mrs. Bryan Walker. And I find that that home is a nurturing home, that Mr. and Mrs. Walker have provided Frank with the full measure of love and solicitude, that he has generally thrived in that home, and that it would be seriously damaging to his well-being to uproot Frank at this point in his life. He's just about entered adolescence. It's a difficult period. And as Dr. Paul pointed out in his evaluation in 1975 when Frank was evaluated to determine whether it was suitable for him to go to Tennessee, "To disrupt such a close relationship would do Frankie singular psychological harm and injustice."

"Coming to a more recent evaluation, the evaluation by Sue C. Wright in Tennessee, which report has been received, after her interview with Frank, she likewise offers the opinion that a move at this point would have a disruptive and unsettling affect on him.

"From the Court's own conversations with Frank in chambers and from the testimony offered by Mr. and Mrs. Walker, I conclude that to uproot Frank at this point would be a cruel thing for him, and while I'm troubled by the pain that this obviously causes

Mrs. Brown, nevertheless, the Court must be mindful of the necessity of the child's welfare and well-being as a matter of paramount importance in this regard.

"So I conclude that Frank Brand's physical, mental, emotional, and educational, welfare would be advanced, and I find that this is the case as a matter of clear necessity by remaining in the custody of Mr. and Mrs. Walker from Kingston, Tennessee under the continuing auspices of Children and Youth Services.

"I do believe that there ought to be expanded visitation with Mrs. Brown. Young Frank indicated to me the pain that he feels about this whole ordeal and would like expanded visitation. My thought is that he should be with Mr. and Mrs. Brown at least over the Christmas recess each year, Easter recess if he has such each year, and a good solitary period of time each Summer so that the relationship with his mother is fostered to the extent that it can be under the circumstances.

"I'll hear what you have to say in that connection, Mr. Walder.

"MR. WALDER: Obviously, Your Honor, we would be looking for Frank to be able to visit with his mother as much as possible. I think the visits should be a lot more than the one-day period that they were before.

"THE COURT: I fully agree. I think it ought to be uninterrupted overnight for as long a time as he can be away from school at recess. I think the Walkers would concur in that.

"MR. WALDER: I think it's very important, Your Honor, to everyone concerned that he have as much time as possible with his mother. The facilities are there. I don't think there's any question as to the facilities. I'm sure that Mrs. Brown has no objec-

tion to Mr. Landes checking on her to see what goes, and she's willing, I'm sure, to cooperate with anyone that Your Honor might feel would be an aid to sometime reuniting mother and son.

"THE COURT: Yes. I think we have to take this in easy stages. My conclusions are based upon the evidence that I heard today, but obviously the continuing goal should be to establish a solid relationship as between Frank and his natural mother. And so all the visitation that is possible I think should be extended.

"Do you agree with that. Mr. Myers?

"MR. MYERS: Yes, I do, Your Honor.

"THE COURT: Can I leave it to you gentlemen to work out schedules?

"MR. WALDER: I'd be glad to try to work out schedules.

"Your Honor, I just wanted to make clear that transportation will be provided for the child to and from?

"THE COURT: As heretofore.

"MR. MYERS: I'm sure that they can do that, Your Honor."

A reading of Mrs. Brown's testimony will itself establish the basis of the court's findings of dependency and buttress the testimony of Mrs. Lester that Mrs. Brown is unpredictable; sometimes cheerful and friendly while at other times she is angry and hostile, that she is incapable of providing the proper parenting authority Frank needs.

While on the stand, Mrs. Brown became very agitated, wringing her hands and bursting into repeated outcries of "He belongs to me, not to the Walkers," and "He belongs to me." Mrs. Brown stated that she loves Frank, (of which we have no doubt), and she is lonely without him and wants him with her. When questioned about the supervi-

sion she would provide, Mrs. Brown indicated that her primary concern is that Frank have fun and therefore he would be free to do as he pleases. She further testified that if Frank were permitted to live with her, he could take care of her.

Most striking in her testimony is Mrs. Brown's total lack of recognition or appreciation for the dedication and care the Walkers have shown to Frank over the years. Mrs. Brown stated at one point, "And I love my son very much, and he belongs to me, not the Walkers. Because I don't like the way the Walkers are treating my boy." When asked directly whether she felt the Walkers had done a lot for Frank she answered, "No, I don't think they didn't." From the evidence, the court found that Mrs. Brown clearly misconceives the nature of her "high duty" as a parent. Her testimony and demeanor reveal an unhealthy possessiveness towards Frank and her attitude suggests an unwholesome emotional dependency. Again, as example, Mrs. Brown testified that she told Frank, "No, Frank, you're not staying down with those Walkers. You belong to me, and I want you home before it's too late."

Turning to the appellant's statement of matters complained of, initially, she claims it was error for this court to allow the oral amendment of CYS's petition alleging dependency.

This claim is clearly without merit as the Montgomery County Rules of Juvenile Court provide specifically for such amendment.

"Amendment of Petition: The Court, on Motion of any party or on its own Motion *at any time during the course of proceeding*, may direct the amendment of the Petition. If any such amendment results in a substantive variance from the facts originally alleged, the Court shall grant such con-

tinuances as justice may require." No. 406(f). (Emphasis added.)

Not only was the amendment permissible and proper in the instant matter, but counsel for Mrs. Brown failed to object to it at the time of hearing. We find that there was no substantive variance from the original petition, nor was there any request for continuance, therefore, no prejudice resulted to appellant.

Appellant next contends that it was error to refuse to grant her motion to dismiss at the conclusion of the Commonwealth's case. Suffice it to say that the testimony of Mrs. Lester and Mrs. Walker was sufficient to establish a prima facie case of dependency.

Next counsel for Mrs. Brown has claimed that it was error for the court to admit Dr. Paul's report, and Sue C. Wright's report and Mrs. Brown's school record over objections. Briefly, the school record, though admitted, is regarded by this court as having little probative value though still relevant and, therefore, is of minimal consequence to our decision. The psychologists' reports, however, are quite different. For purposes of disposition, for which Dr. Paul's and Sue C. Wright's report were introduced and admitted, this court is free to examine and hear evidence which may not otherwise be admissible as competent evidence in an Adjudication Hearing. The Juvenile Act provides:

"In Disposition Hearings under Subsections (b) and (c) *all evidence helpful in determining the questions presented,* including oral and written reports, may be received by the Court and relied upon to the extent of its probative value *even though not otherwise competent in the hearing on the Petition.* The parties or their counsel shall

be afforded an opportunity to examine and controvert written reports so received and to cross examine individuals making the reports." . . . 42 Pa.C.S.A. §6341(d). (Emphasis added.)

The language of the Montgomery County Juvenile Court Rules coincides with this language. "The Court need not be bound by strict evidentiary rules but may admit such evidence, including hearsay and opinion evidence, as is material and relevant to the disposition to be made." M.C.J.C.R. 502(d).

Finally our disposition pursuant to 42 Pa.C.S.A. §6351[1] continuing Frank in the custody of the Walkers was not predicated upon the "best interest of the child" standard applied in custody matters. Appellant's assertion to the contrary is simply erroneous. The disposition followed upon our conclusion that Frank is a "dependent child" and that to provide for a continuation of Frank's wholesome development, it was "clearly necessary"[2] that he continue in the custody of Mr. and Mrs. Walker.

---

1. "(a) General rule. If the child is found to be a dependent child the Court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child: . . .

(2) Subject to conditions and limitations as the Court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth who, after study by the probation officer, or other person or agency designated by the Court, is found by the Court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child." 42 Pa.C.S.A. §6351.

2. LaRue, supra; Stapleton v. Dauphin County Child Care Services, 228 Pa. Super. 371, 324 A. 2d 562 (1974).