434 A.2d 815

**In re Joseph Lee BREISCH.**

**Appeal of Debra K. BREISCH, Natural Mother of Joseph Lee Breisch.**

Superior Court of Pennsylvania.

Argued Sept. 10, 1980.

Filed Sept. 18, 1981.

John B. Dunn, Allentown, for appellant.

Malcolm J. Gross, Allentown, for participating parties.

Before SPAETH, HESTER and CAVANAUGH, JJ.

CAVANAUGH, Judge:

This is an appeal by Debra K., the natural mother of Joseph Lee. Joseph Lee was adjudicated dependent and his custody was transferred from the appellant to the Lehigh County Office of Children and Youth Services. The mother does not challenge the finding of dependency, but claims that the child was removed from her custody absent the requisite proof of clear necessity. We disagree and affirm the order of the lower court.

The child was born May 10, 1976. He was initially placed with Children and Youth Services (hereinafter C&YS) in June, 1977. On June 29, 1978, he was returned to his mother with the proviso that his care remain under the supervision of C&YS for at least six months. The mother's failure to care for her son adequately during this period prompted the commencement of the instant action. Diane Avila, the mother's caseworker, filed a petition alleging dependency pursuant to 42 Pa. C.S.A. § 6334.

When the child was returned to his mother's custody his speaking ability was average for a child of his age. However, once at home this ability deteriorated and a treatment plan was formulated. The child was to attend the Lehigh Valley Child Care Center where he would be given professional speech therapy. Because his home environment was deemed to be critical, a home visitor, Carol Barrett, was assigned to work with the mother and child in their home. Her objective was to teach the mother parenting skills to enable her to function as the child's primary educator. According to testimony, this was an essential adjunct to the professional speech therapy because the child's problem required constant work.

There is no dispute as to the seriousness of Joey's speech problem. Without therapy the prognosis was bleak. Susan L. Moon, Director of the Speech, Language and Hearing Service of Lehigh County, testified to this as follows:

Q. How important in the overall scheme of this child's development are the areas that you have noted here today?

A. Extremely important. If the child is not understanding language he's going to have a very difficult time in school. If a child is not able to express himself he will not be able to attend, you know, a normal school program.

Q. What will happen if this child does not receive the therapy and home stimulation that you have recommended? What will happen to him?

A. I think he's just going to continue to remain on the level that he's currently functioning on but as he increases in age there's going to be more and more of a gap between where he should be performing and where he is performing and special provisions will have to be made in school.

Q. Will that affect his ability to progress in school if he doesn't move forward in language?

A. Absolutely.

Q. Will it affect his ability to function as a human being?

A. Certainly will.

The program, however, was a failure. The child attended 58 out of 160 day case sessions between July, 1978 and April, 1979. Most of the days he attended were during the first few months of the program. Because of his poor attendance, the child could not receive speech therapy and funds were finally withdrawn. The Home Start Program which Carol Barrett ran also failed. The mother was only available for twenty-nine per cent of the weekly visits which had been arranged. The visits were arranged at the mother's convenience for the same time and day each week. Often the mother would not notify the Home Visitor that she or the child would not be at home for the visit. On those few occasions when both mother and child were available, it was

clear that the mother was not working with the child between visits. In fact, as Ms. Barrett testified, the child was regressing in his language abilities, his development was seriously impaired and he was in need of immediate therapy. It was Ms. Barrett's opinion that the mother did not understand the importance of her cooperation with the child's therapy.

Diane Avila, the child's caseworker from C&YS, shared Ms. Barrett's concern that the child was regressing and that the mother was not cooperating with his therapy. Despite Mrs. Avila's attempts to improve the situation by reestablishing goals for the mother, the mother indicated that she would not cooperate. The mother further stated that if Mrs. Avila wanted to file a court action, she could go ahead and do so. In the caseworker's professional opinion, the mother did not understand the importance of her cooperation to her son's development. Also Mrs. Avila observed an absence of "anyone particularly caring for the child or providing direct supervision for the child as you would need to provide for a three year old child or a two year old child when he was first returned.

Speech pathologists from the Speech, Language and Hearing Service of the Lehigh Valley, conducted evaluations of the child's language ability as of January, 1979 and June, 1979. The results of these evaluations were admitted into evidence. In January, 1979, the child was two years and seven months old. According to the evaluation his expressive language was rated at two years and five months. By June he had regressed to two years and zero months. On a scale which evaluates a child's ability to be normal, mild, moderate or severe, his expressive language delay was severe. The child's ability to understand language was also below his age level and showed no improvement between January and June which meant that he was further below his age level in June than he had been in January. Joey's receptive vocabulary ability improved between January and June, but remained below his age level. Finally, Joey was found to have a severe articulation delay, which means that

he was not able to produce the basic sounds which are needed to speak the language.

The testimony of the caseworkers who visited the mother's home regularly indicated that Joey was exposed to a chaotic and harmful home life. The mother is a lesbian who effects a masculine appearance, wears men's clothing, and has a masculine oriented mental status. At the time of the hearing she lived with Nancy Maruschak and two of her children in a two bedroom apartment. Various other youths lived in the apartment from time to time. On one visit Mrs. Avila found an old man who was dirty and lice-ridden living in the apartment. The mother had invited him to live with her because she was lonely. The two women engaged in blatantly sexual conduct in front of the children. There was evidence that Joey slept on a couch in the living room, which was separated from his mother's and Nancy's bedroom only by an archway.

The mother disregarded Mrs. Avila's instructions not to permit a woman to care for Joey who was an alcoholic and unfit to care for children. Evidence also revealed that the women kept marijuana in the home, provided it to children in the apartment and smoked it with them. Also one of Nancy Maruschak's sons testified that he and Joey's mother had stolen furniture from people's porches.

The child's home life is of great importance to his speech development. The speech pathologists testified that the child lacks the stimulation which is normally provided by the family. The mother's own unwillingness to cooperate and her apparent inability to understand Joey's problem combined with the unstable home life she provided made the close relationship between parent and child, so necessary to Joey's development, an impossibility. Accordingly, the child was adjudicated dependent on July 2, 1979.

The Juvenile Act defines a dependent child, in relevant part, as a child who "is without parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emo-

tional health, or morals." 42 Pa. C.S.A. § 6302. *In the Interest of Pernishek,* 268 Pa.Super. 447, 458, 408 A.2d 872, 877 (1979). A finding of dependency must be from clear and convincing evidence. 42 Pa. C.S.A. § 6341(c); *In the Interest of Black,* 273 Pa.Super. 536, 417 A.2d 1178 (1980). Once a child is found to be dependent, a dispositional hearing must be held to determine the proper placement of the child. 42 Pa. C.S.A. § 6341(c). The standards for determining dependency and disposition and the scope of this court's review of such findings were adequately set forth in *In the Interest of Pernishek, supra,* 268 Pa.Super. at 457, 408 A.2d at 877:

> In order to preserve family unity "whenever possible," the Juvenile Act provides that our courts: (1) may not find a child dependent" absent clear and convincing evidence and (2) after making such a finding, may not separate the dependent child from his parents unless such separation is clearly necessary. 42 Pa.C.S.A. §§ 6301(b)(1) and (3) and 6341(c). *See In re Whittle,* [263] Pa.Super. [312], 397 A.2d 1225 (1979); *In re Clouse,* 244 Pa.Super. 396, 368 A.2d 780 (1976). To ensure a proper resolution of these issues, separate counsel should represent the child at the dependency hearing, and the hearing judge should conduct a comprehensive inquiry by receiving evidence from both interested and disinterested witnesses and should support his decision in an opinion in which he discusses and analyzes the evidence fully. *In re Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977); *In re Clouse, supra*; *In re La Rue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976); *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974); *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973).

There is no dispute that the evidence presented below was "clear and convincing" as to the child's dependency. At the conclusion of the dependency hearing, the judge permitted the child to remain with the mother pending the dispositional hearing. The court directed that the mother cooperate

with the Children and Youth Services. A hearing was scheduled to be held within forty-five days.

At the subsequent hearing Carol Barrett, the Home Start worker, testified that the mother's attendance at the weekly sessions was greatly improved. However, she reported that although the mother cooperated superficially, it was clear that there was no follow-up work done with Joey between visits. Also, Ms. Barrett testified that the mother fails to understand the needs of the child and how to work within the therapy program. She stated that the mother likes the child the way he is and is unable to formulate goals for his development.

Mrs. Avila also found the mother to be uncooperative. The mother took notes throughout her meetings with the caseworker and responded in an adversarial manner that her attorney, John Dunn, "knows about this. John Dunn says it's okay. I tell John Dunn everything you tell me." In view of this, Mrs. Avila found it impossible to work with the mother. Also as part of a case plan contract signed by the mother subsequent to the finding of dependency, it had been agreed that Dean, one of Nancy Maruschak's sons, not live in the apartment. The boy "is a very, very nervous child" and difficult to control. Despite the case plan, the boy had continued to reside there. Also the mother continued to permit Joey to be left with a woman who is an alcoholic and unfit to babysit him. Moreover, the mother threatened a neighbor not to testify against her at the dispositional hearing. Mrs. Avila once again recommended that the child be removed from the mother's home.

Dr. Raymond Seckinger, a psychiatrist with a special interest in child neglect, interviewed the mother. Dr. Seckinger was familiar with the history of the case and Joey's difficulties prior to the interview. The child was not present at that time. The conclusions reached by Dr. Seckinger were strikingly similar to those reached by Mrs. Barrett and Mrs. Avila. He stated: "She's not able to comprehend directions, instructions and especially she's not able to comprehend the needs of the child." According to Dr. Seckinger

the mother has a learning disability which prevents her from understanding her own feelings as well as those of others. Also he indicated that, although this disability is not hereditary, Joey is in jeopardy of suffering from this same learning disability. The doctor, however, was optimistic that eventually with therapy the mother could acquire parenting skills. It was his opinion, however, that in order for this to come about the child should be separated from his mother except for liberal visitation. The following exchange took place during cross-examination:

Q Doctor, isn't it also true that sometimes separation results in a tension with the parent that can lead the other way, can provide a lack of incentive and be an impediment to the parent working with the responsibilities they need to work with?

A In my clinical experience I have never seen that happen. The parents realize the importance of distance from the child to be able to understand the child's needs. If the parent doesn't get distance they can't see the child. They never will see the child. Distance, I am talking about, emotional differentiation so I have never seen anybody be hurt by the separation. I have seen them get depressed or go through feelings. That's what they go through but that we understand and that's part of the positive trauma. That's what we expect so then when they re-enter with the child they really have something going. Then they can sense where the child is.

Q You fully expect whenever children are separated from the parents it provides a positive incentive from the parents, it will work out and very likely the child will return to the parents?

A In this particular situation.

It was Dr. Seckinger's opinion that Joey's future development and emotional health would be threatened if he were to remain with his mother.

In contrast to the other witnesses, Rose Simco, a speech pathologist, testified to Joey's progress and his mother's cooperation. Joey was scheduled for therapy three times a

week with Ms. Simco. She reported that there was no problem with attendance and that the mother was apparently working with Joey between sessions. Joey showed progress in three areas that the therapist had worked on. However, despite this progress, the child is still below his age level. Ms. Simco stated that he has "a fair chance" of catching up to his age level in the three areas of sound development, understanding of language and expressive language. Ms. Simco was not able to give an opinion as to what effect separation from his mother would have on Joey's development.

Following the disposition hearing the lower court judge indicated that he would prefer to keep the matter open for another ninety days to further monitor Joey's development. The court, however, stated that the mother must cease living with Nancy Maruschak but made clear that the court was not otherwise interfering with their relationship. The mother refused to follow this directive. A discussion ensued whereby the court attempted to explain its position but the mother continued in her refusal. At that point the court entered its order placing custody of Joey with the Lehigh County Children and Youth Services for foster care. In its opinion the court explained its decision as follows:

> We believe that it was essential that a modicum of order and consistency be established in Joey's household because all of the experts had indicated that he required the care and attention of Debra as a 'primary educator.' Appellant stated at the final hearing that she would not abide by the conditions and would continue to live with her paramour. Her refusal to accept this condition, in itself, was not the deciding factor in our determination to remove Joey from her custody. Rather, her refusal revealed forcefully her true feelings and attitudes regarding Joey's therapy. It became readily apparent that the testimony of various witnesses as to appellant's cooperation to the least extent possible with the caseworker and home visitor was entirely correct. The court is now convinced that appellant has

neither the ability nor the inclination to appreciate the seriousness of Joey's disability.

We agree with the lower court's determination. Our own review of the record indicates that there was ample evidence of the clear necessity to remove Joey. This court has held that where there are inadequacies in the child's home, the court should first consider ordering a child welfare agency "to take the steps necessary to instruct the parents in the skills needed, and provide follow-up supervision in the home, where feasible." *In the Interest of Whittle*, 263 Pa.Super. 312, 316, 397 A.2d 1225, 1226 (1979), *citing Matter of DeSavage*, 241 Pa.Super. 174, 187, 360 A.2d 237, 243 (1976). Here even before the dependency hearing C&YS was involved in the home. Despite this involvement, the mother's parenting skills did not improve nor did the chaos within the child's home subside. While Rose Simco testified to the child's progress and the mother's cooperation, social workers Barrett and Avila who had worked with the mother for a much longer time and who had regularly visited the home could cite no progress in the mother's care nor in the child's environment. During the initial hearings speech pathologist, Susan L. Moon, explained the importance of the home environment on Joey's development:

Q How important is the home environment in what you have just said as opposed to the therapy sessions that you are able to offer?

A The home environment is extremely important. If the home environment had been more conducive to language stimulation Joey today would, you know, be functioning on age level. In terms of the environment now by itself helping get Joey up to age level, I think, he also needs the professional help, okay, because we do have that delay there.

Q But, even with the professional help, is the home environment of any significance?

A Absolutely. Absolutely. We only see a child two, three times a week for a half hour and we can't do it alone.

Q  And you mean that there must be on-going stimulation of this child's development in the many hours that you don't see him?

A  Absolutely.  Absolutely.

The pathologist also stated that as Joey gets older it becomes increasingly difficult to help the child "because they start realizing what they're not capable of doing and then they're frustrated by it, [so they] get further and further behind."

Appellant argues that the condition placed upon her by the lower court to separate from Nancy Maruschak was unwarranted, unnecessary and unreasonable, and that her refusal to accept that condition does not establish evidence of "clear necessity" to remove the child.  In her brief appellant states, "Judicial intervention with lesbian relationships in the interest of a child cannot be countenanced unless close causal connection between the lesbian relationship and the child's improper parental care, control, development or well being is shown."  The mother, however, misconstrues the lower court's purpose in separate living arrangements. The court made it abundantly clear that it was not seeking to interfere with the relationship between the women.  The goal of the court was to establish order in the child's home so as to foster the close relationship between the mother and son which, as all the experts agreed, was so badly needed. The disruption which the presence of Nancy Maruschak and her family created has been well documented.  Moreover, even prior to the mother's refusal to comply with this condition, evidence had been presented of the clear necessity to remove Joey.

We affirm the order of the court below.  However, we note that a stipulation was placed on the record whereby the parties and their counsel agreed to formulate a case plan outlining the resources to be offered the mother and the steps she must take in order to regain custody of her son. Thus should circumstances change the mother is free to

petition the lower court for a rehearing as to her child's disposition.

Order affirmed.