406 A.2d 1116

**In re Kyiah JACKSON.**

**Appeal of Queen JACKSON.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1978.

Decided June 29, 1979.

Charles C. Shainberg, Philadelphia, for appellant.

Mary Rose Cunningham, Assistant City Solicitor, Philadelphia, for appellee City of Philadelphia.

D. Mullins, Child Advocacy Unit, Philadelphia, for appellee Kyiah Jackson.

Beverly Nelson Finney, Philadelphia, on brief, for appellee Elizabeth Jackson.

Before CERCONE, SPAETH and LIPEZ, JJ.

SPAETH, Judge:

On August 26, 1977, the lower court adjudged appellant's infant daughter, Kyiah Jackson, a "dependent child" under the Juvenile Act, Act of Dec. 6, 1972, P.J. 1464, No. 333, § 2, as amended, Act of Aug. 3, 1977, P.L. 155, No. 41, § 1, 11 P.S. § 50–102(4), which provides:

> "Dependent child" means a child who: (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals .   .   ..

On September 23, 1977, the court ordered Kyiah placed under the joint custody of appellant and appellant's mother [1] and further ordered appellant referred to neuropsychiatric counseling.  This appeal followed.

The basis for the finding of dependency was an incident that took place on August 15, 1977, outside a courtroom in which Kyiah's father was on trial for murder.  At the dependency hearing this incident was described as follows.  Appellant had just testified in the murder trial;  in the course of her testimony she had said she lived at 1303 South 15th Street.  While appellant was outside the courtroom, with Kyiah in a baby carriage, Mrs. Irene Watson, the mother of Kyiah's father, approached appellant and said to her, "Queenie, you don't live [at] 1303 South 15th Street." N.T. Aug. 26, 1977 at 3.  Mrs. Watson testified that appellant began screaming, pulled a broken drinking glass from

---

1.  Kyiah had been in temporary custody of the Philadelphia Department of Public Welfare since August 15, 1977.

her handbag and yelled, "If you don't leave me alone I will kill her," meaning Kyiah. Then, Mrs. Watson testified, appellant rushed down the hall, pushing the carriage, until she came to an open window, where she picked Kyiah up and stood by the window. Mrs. Watson tried to get Kyiah from appellant but appellant told her not to touch Kyiah. Mrs. Watson then summoned a police officer, who led appellant away from the window. Kyiah had suffered no harm.

Appellant testified that she had picked the broken glass up from an ashtray outside the court, for use in case of a fight in connection with the murder trial. She admitted pulling out the broken glass and telling Mrs. Watson to stay away, but she denied threatening to hurt Kyiah, and said she had had no intention of hurting her.

■ The purpose of the Juvenile Act is to preserve, whenever possible, the unity of the family; children should be taken from their parents only in cases of clear necessity. *In the Interest of Whittle*, 263 Pa.Super. 312, 397 A.2d 1225 (1979); *In the Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976). The burden of proof is on the party asking that the child be taken from its parents, and the evidence in support of the request must be clear and convincing. *In the Interest of Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1977); *In the Interest of LaRue, supra.* Clear and convincing evidence is

> testimony [that] is so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*LaRocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

■ Appellant argues that these standards cannot be satisfied when the evidence discloses only one isolated incident; according to appellant, the cases hold that only evidence of longstanding patterns of behavior can provide a sufficient basis for a finding of dependency. We disagree. There is no logical reason why evidence of one isolated incident might not reveal such a degree of parental indifference as to enable the hearing judge to find without hesitancy that a

child should be taken from a parent: for example, if a parent *were* to drop a child out the window. We do agree with appellant, however, to this extent: the standard of clear and convincing evidence will be more *difficult* to satisfy in a case of one isolated incident.

In deciding whether the evidence here was sufficient to support an order taking Kyiah from her mother, two procedural aspects of the case should be noted.

■ First, at the hearing on whether Kyiah should be found dependent, the lower court received evidence of the adequacy of Kyiah's two grandmothers' houses as places for Kyiah to live, should she be found dependent.[2] The court recognized that this evidence was out of sequence, and said it would not take the evidence into consideration in determining dependency. We nevertheless mention the point as a point of practice important to dependency proceedings generally; as we noted in *In the Interest of LaRue, supra,* the danger in counsel offering, and the hearing judge receiving, such evidence is that the "clear necessity" test, applicable in a dependency proceeding, is likely to become confused with the very different "best interest of the child" test, applicable in a custody proceeding.

■ Second, at the hearing on whether Kyiah should be found dependent, the lower court received no expert testimony. At the later disposition hearing, two psychiatrists did testify as to appellant's mental state. The lower court recognized that such testimony would have been useful in resolving the issue of dependency, for the testimony figures heavily in the court's opinion. Again, as a point of practice, we note that when the hearing judge believes the evidence offered at a dependency hearing to be incomplete he not only may but

> should receive, and if necessary should seek out, evidence from objective, disinterested witnesses.
>
> *In the Interest of LaRue, supra,* 244 Pa.Super. at 229, 366 A.2d at 1276.

---

2. In fact, appellant was living with the maternal grandmother at the time of the hearing.

These procedural aspects of the case noted, we may turn to the evidence that was offered to the lower court at the dependency hearing. The only witnesses were Mrs. Watson and a representative of the Department of Public Welfare, and appellant. It was the representative of the Department of Public Welfare who compared the grandmothers' homes. Mrs. Watson's testimony and appellant's testimony have been summarized above.

The lower court found as a fact that Mrs. Watson's version of the incident was more credible than appellant's, that is, that appellant did threaten to kill Kyiah and did pick her up and stand by the open window. These findings were clearly within the court's power, and we shall not disturb them. However, in the context of a dependency hearing, the question at issue was not only whether appellant *did* these acts, but in addition, what he *intention* was. One who yells, "If you don't leave me alone I will kill her," does not necessarily mean to carry out the threat. Before the lower court could declare Kyiah dependent, it was obliged to have before it clear and convincing evidence that the threat was made, *and* was made with the intention of carrying it out. Given evidence of the context in which the threat was made, a finding of dependency might then well be warranted, even though the threat represented one isolated incident.

Here the lower court advises us in its opinion that the later psychiatric testimony was not a factor in its finding of dependency. Lower court opinion at 4. It therefore appears that the court found only from the evidence that we have summarized that appellant intended to carry out her threat. We are unable to say that the evidence in support of such a finding was clear and convincing. Nothing suggests that Mrs. Watson knew enough about appellant to make her testimony on the question reliable—if indeed she had been asked the question directly, which she wasn't. In addition, it may be noted, Mrs. Watson testified that if Kyiah were to be found dependent, she would like custody of her; she was therefore hardly a disinterested witness. Indeed, she appears to be anything but disinterested, for quite apart from

her interest in Kyiah, it was her son who was on trial for murder, and while we do not know what appellant said, we do know that she did testify as a witness at that trial, and that Mrs. Watson disagreed with her testimony at least as regards the address she had given. *See In the Interest of LaRue, supra* (emphasizing the importance of disinterested testimony as an ingredient of clear and convincing evidence). Finally, appellant's own actions belied her threat. Mrs. Watson did *not* leave appellant alone but instead tried to get Kyiah from her, and also summoned the police; yet appellant did not kill Kyiah, or harm her in any way. Without doubt, a threat to kill a child is a grave matter. Something must be allowed, however, for the extraordinary context of the threat; a woman who has just testified as a witness in a trial at which the father of her child is charged with murder is not likely to be in a composed state of mind.

Under other circumstances we should consider remanding for further testimony. However, in this case we have the benefit of the later testimony, received at the disposition hearing, which the lower court found "supports the court's observations." Lower court opinion at 4.

The lower court refers to testimony by a doctor from the court's psychiatric department,[3] who examined appellant for about one and one-half hours total. N.T. Sept. 23, 1977, at 6. On direct examination, the doctor read from his report:

A Well, at that time I found her to be a cooperative person rather somber faced, depressed, and dispirited. There was *nothing to suggest any psychotic thought disorder.* She was in contact with reality, intelligence struck me as being within normal boundaries. She was cooperative enough but not particularly spontaneous or verbal, probably because of her being depressed and discouraged with the whole situation. I reviewed her background and as noted she comes from a rather dismal, discouraging background. She, herself, has had lots of institutional experiences and considerable stormy and chaotic confron-

---

**3.** The court disregarded the testimony of appellant's own psychiatrist, on the ground that it was based on the facts as recounted by appellant.

tations with either hearing or being present, I'm not sure. Hearing undoubtly [*sic*] of murders of her father being murdered and then this homicide situation in which he's presently involved. Her personal relationships always seemed to be disappointing and rejecting. With respect to this incident as she described and as I put down here I felt she was driven into an hysterical frenzy of threats that were directed at her by her most recent paramour. I felt that what she did was extrinsic reaction. Impulsive, short-sightedness, but that *basically she didn't mean to harm the infant.*

*Id.*, at 9–10 (emphasis supplied).

On cross-examination the doctor testified as follows:

Q   You stated in your report that "I do not feel that she basically meant harm to the infant but was driven to a state of hysterical despair."

Do you see where Miss Jackson would be any danger to the child that she doesn't mean to harm the child even under the most severe stress?

A   *I can't answer that question.* I think under a considerable stress with her personality makeup, *it's possible.*

Q   But under this particular circumstance that didn't happen because it was on your opinion that she didn't mean to harm the child?

A   Basic inclination was not to harm the child, but I put in here—carried away—driven into a state of hysterical despair. She *could have been capable, might have been capable.*

Q   But she was—

A   Of carrying—

Q   But she was driven to that hysterical despair. That's what you wrote?

A   Yes, I know but it's fortunate that she didn't. But you're asking me theoretical questions, and I can't guarantee. I would say that *under these terribly traumatic, emotional conditions* to which she was exposed, *perhaps the scales were very close one way or the other.*

*Id.*, at 16–17 (emphasis supplied).

We cannot say that this testimony meets the requirement of clear and convincing evidence.[4]

The order of the lower court adjudging Kyiah dependent is reversed.

LIPEZ, J., files a dissenting opinion.

LIPEZ, Judge, dissenting:

I dissent and would affirm on the able opinion of Judge Stern for the court below. I believe he properly applied the "clear necessity" test and found dependency from "clear and convincing evidence." Having made that finding Judge Stern fashioned a sensible remedy which provided for joint custody by the mother and the maternal grandmother, with provisions for proper supervision and neuro-psychiatric counseling of the mother, with review in three months. I think the majority fails to accord the deference due to the trial judge's findings, a result which I fear in this case is fraught with danger.

---

4. The lower court's disposition of Kyiah suggests that after all, neither did it find the evidence clear and convincing. The court ordered Kyiah placed in the joint custody of appellant and appellant's mother. Since appellant lives with her mother, this order did not put Kyiah out of the danger her mother was supposed to represent to her.