429 A.2d 1150

**In the Interest of THERESA E., Debbra and George E., minor Children.**

**Appeal of JANET E.**

Superior Court of Pennsylvania.

Argued Nov. 12, 1980.

Filed May 15, 1981.

---

William E. Buchko, New Castle, for appellant.

Robert F. Hawk, District Attorney, Butler, for Butler County, participating party.

Gwilym A. Price, III, Butler, for Minors, participating party.

Claude V. Falkenhan, Zelienople, for Natural Father, participating party.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal by the mother of three children from orders finding the children dependent children under the provisions of the Juvenile Act[1] and awarding their custody to the Butler County Children and Youth Agency, with placement in the home of their father. We have concluded to remand for further proceedings, consistent with this opinion.

The parents were married on January 24, 1970. The children are Theresa, born August 3, 1971, Debbra, born July 27, 1972, and George, born August 15, 1978.[2] The parents separated in December 1976—before the birth of George— Theresa and Debbra remaining with their mother. A bitter legal battle between the parents ensued, which we see no need to summarize, except as it is relevant to the issue of whether the children are dependent children.

In November 1978 the Butler County court, with the parties' consent, entered an order providing that Theresa and Debbra were to visit their father on Sunday afternoons. In April 1979 the father took the girls and did not return them to their mother. Slip op. at 2. He then brought an action in Beaver County, where he lived, seeking custody of the girls. Ultimately, this action was dismissed by the Beaver County court. Brief for father, at 5, 7. Meanwhile, the mother brought an action in Butler County, asking that the father be held in contempt for his failure to return the girls. The Butler County court found the father in contempt and ordered him imprisoned until he returned the girls. Finally, on July 3, 1979, the father returned the girls to their mother. Slip op. at 2.

On October 14, 1979, the father picked Theresa up for a visit. When he went to return her, the mother was not

1. 42 Pa.C.S.A. §§ 6301 et seq.

2. Originally, the father denied that he was the father of George. On September 12, 1979, however, the lower court found that he was the father. No appeal was taken from this order. Slip op. at 1. (References to the lower court's opinion are to the opinion prepared pursuant to Pa.R.App.P. 1925.)

home. The following day the father and his attorney took Theresa to the Children and Youth Agency of Butler County. After he and his attorney made a number of allegations about the mother's mistreatment of Theresa, Theresa was detained by the Agency.

On October 22, 1979, the father filed petitions with the lower court alleging that Theresa, Debbra, and George were dependent children. Adjudication proceedings on all three petitions were held on November 5, before a master appointed by the lower court.[3] As required by the Juvenile Act, the children were represented by separate counsel. 42 Pa.C.S.A. § 6337. The master found all three children dependent and recommended that they be placed in the temporary custody of the Children and Youth Agency pending a disposition hearing. The lower court adopted the master's findings and approved his recommendation. On November 26 a disposition hearing was held, after which the master recommended that the children be placed in the custody of the Agency, with placement in the home of their father; that the children, their parents, and JoAnn Goodman (the woman with whom the father was living) undergo counseling as recommended by the Agency; and that a reasonable visitation schedule between the children and their mother at a neutral facility be established. Again, the lower court adopted the master's findings and approved his recommendations, and entered an order accordingly. It is from this order that the mother has appealed.

The master's report contained the following findings:

The testimony presented indicates that the juveniles have been residing with the mother and that the home facilities are limited as to providing proper care for the three youths, the mother having a one-room apartment with bath and kitchen. Sleeping arrangements seem to be inadequate.

Further appears from the testimony presented that there has been conflict between the parents, who have not

3. Hearings before a master are authorized by the Juvenile Act. 42 Pa.C.S.A. § 6305.

resided together for a period of approximately two plus years. The parties have been undergoing various custody problems over this entire period.

The testimony presented further indicates that the emotional stability of the juveniles is very unstable due to, it appears, the conflict generated both internally and externally by the parents and their constant fighting between one another. Should be noted, however, that the juveniles did make some progress while they were in the physical custody of their father for a two to three month period in the spring and summer of this year, as was testified to by their teachers. However, it should be noted that the father obtained physical custody in a very improper manner.

Mr. Wolf, psychologist, testified and indicated that both juveniles are instable and are very easily influenced. He further indicates that Theresa demonstrates a passive resistance, and is very easily distracted. He further indicates that Debbra appears to be depressed and due to this depression is lagging behind in here psychological development at her age level. He further indicates that he feels the problems of the juveniles are in part a result of the constant custody battle between the parents, or at best, this conflict contributes to the juveniles' problems.

Further appears from the testimony presented that both parents truly love their children; however, this is overshadowed by the bitterness they demonstrate towards one another.

The Master did interview both juveniles at the request of the attorneys for all the parties, and the juveniles seem to be unstable and emotionally overwrought, expressing a desire to live with their father, and at other times with their mother.

Master's report on Nov. 5, 1979, hearing at 2–4.

In its opinion, the lower court stated its reasons for finding the three children dependent as follows:

Theresa and Debbra were neither physically ill nor undernourished. They were not abused physically by the

parents. They were depressed and emotionally upset. This condition had developed over a period of nearly two years. Debbra wanted to live with her mother, while Theresa kept changing her mind about the parent with whom she would elect to live. Considerable legal turmoil between the parents preceded October 15, 1979 when Attorney Falkenhan and his client, George M. [E.], brought Theresa to the Children and Youth Agency. On that date George M. [E.] filed a complaint alleging dependency. Theresa was eight and one-half years of age at the time, and she was in a hysterical condition. It is noteworthy that she had been visiting her father.

These children have been victimized by the parents. The parents burdened the children with their personal hatreds arising from the marital conflict. The motivation of the parent may be love or hate. It may be the support payment or the welfare check. It may be combinations of such factors. Nevertheless, each parent is responsible for what has happened. The children have been used, and they have been harmed.

The conduct of the parents has been such that both Theresa and Debbra have been without the proper parental care and control that is required for their mental and emotional health. The infant George is too young to evidence the same symptoms as his older sisters. However, the same conditions that have harmed Theresa and Debbra affect George, and the children should not be separated. Each is a dependent child as defined by the Juvenile Act, and each is entitled to the protection of the law. This Court re-affirms the findings and recommendations of the Master.

Slip op. at 3–4.

The court stated its reasons for adopting the disposition recommended by the master—placement of the children in their father's home—as follows:

The custody of the children has been vested in the Children & Youth Agency of Butler County. The recommendation of the Agency that the children be placed in

the home of George M. [E.] was approved by the Court. This decision is supported by the evidence. JoAnn Goodman and her four children have lived with George M. [E.] since March of 1978. They occupy a thirteen room house on a two and one-half acre plot. The father's living accommodations, described as comfortable, are much preferred to a small second floor apartment with one double bed, a couch, and the odor of urine that constitutes the living quarters of Mrs. [E.] In addition, during the spring of 1979, while the children were unlawfully detained by Mr. [E.] and enrolled in the Hopewell schools, their attitude and performance improved. The Juvenile Court will not interfere with the exercise of reasonable discretion by the Agency in the placement of the children. The recommendation of the Agency was certainly influenced in some measure by the failure of Mrs. [E.] to cooperate with the Agency both in locating more desirable quarters, and in undergoing the psychological testing.

The Juvenile Court of Butler County reviews dependency adjudications each six months, and conducts a review hearing after nine months. This will be done. However, subsequent to the dispositional order of November 26, 1979 this Juvenile Court adopted a general policy of granting custody to an Agency without specifying placement or other conditions. When custody is granted after an adjudication that a child is dependent the care of the child becomes the duty and responsibility of the Agency, subject to future review and change by the Juvenile Court. Although the order of November 26, 1979 is specific as to placement this is no longer obligatory on the Agency. At any time that the Agency determines that it is in the best interest of the children, the Agency possesses the authority to change the placement.

It is not to the credit of George M. [E.] that he delivered his daughter Theresa in a hysterical condition to the Agency. He was at least equally responsible for the depressed mental and emotional condition of Theresa and Debbra. It may be that George M. [E.] is a weak, ineffec-

tive, unfeeling and incompetent parent. On the other hand he may be a scheming parent who devised a plan to accomplish an objective. There is no evidence that he personally has been a responsible parent, a good parent. George M. [E.] and his wife victimized these children. Under the facts it is impossible to determine if George M. [E.] erred in originally conceding custody to Mrs. [E.]. After all they lived together as husband and wife for approximately six years, and he left the children in her custody for two years. With one exception there has been nothing constructive in his actions affecting the children. That exception may be his paramour and her family. JoAnn Goodman may be a good influence in the destructive atmosphere that exists between the parents and these children.

The representatives of the Agency have a heavy duty and responsibility. The Court can only hope the care and treatment of the children while in the custody of the Agency will prove to be beneficial. At least the children will have a surrogate parent unaffected by the self-interest factors which have influenced the actions of the parents.

Slip op. at 4–6.

Before we examine the lower court's opinion, and the master's report, in light of the record, it is necessary to dispose of a separate argument made by the father.

In his brief, the father states very frankly, and quite intemperately, that what he has sought all along is a custody decision in his favor:

What [the father] has been trying to achieve all along, and what the Butler Court has refused him, is a custody adjudication. It was only because of the Butler Court's long and improper delays that the children's domestic situation worsened to the point that protective removal of them was necessary. That done, these Juvenile proceedings have served their purpose, and in prosecuting them, [the father] developed adequate evidence for your Honorable Court to make the custody determination which the

Butler Court refuses to make. Your Honorable Court is requested to do so.

Brief of father at 11A–11B.

Also:

The record of this case contains all the evidence, and more, needed to formulate a custody determination such as [the father] has all along sought. These Juvenile Act proceedings, made necessary by the Butler Court's refusal to hear, and by its long and lawless delays, have served their purpose; his children are now safe from abuse. George asks your Honorable Court to make the custody determination, as between him and [the mother], which he has long sought and which the Butler Court has so long refused him.

Brief of father at 20.

■■■ This argument has no merit. In the first place, as will be discussed later, the record does not "contain[ ] all the evidence, and more, needed to formulate a custody decision ..." And in the second place, and at least equally important, the argument ignores the fact that the father initiated this case by filing petitions under the Juvenile Act, asking that his children be declared dependent. The Act contains no restriction on who may initiate dependency proceedings. "A petition ... may be brought *by any person* including a law enforcement officer." 42 Pa.C.S.A. § 6334 (emphasis added). Any restrictions would, in fact, be contrary to the Commonwealth's policy of protecting children. There is nothing to prevent—and there should not be—a non-custodial parent from seeking to protect his or her children from serious harm by filing a dependency petition and invoking the provisions of the Juvenile Act. At the same time, a dependency proceeding under the Juvenile Act is not to be regarded—as the father seems to regard it—as an alternative way for a non-custodial parent to seek custody of his or her children. It is a very serious matter indeed to allege that a child is a dependent child and thereby invite the intervention of agencies of the state into a parent's care of that child. *See In re Custody of Frank*, 283 Pa.Super. 229,

423 A.2d 1229 (1980). It is no less serious when the person making the allegation is also the child's parent. We regard the father's criticism of the lower court as unjustified, and we shall not consider even the possibility of awarding custody of the children to the father. The issue before us, as it was before the lower court, is not whether the father should have custody but whether the three children should be found dependent, and if so, what disposition order should be made.

In considering this issue, we have encountered several difficulties, which not singly perhaps but in combination have persuaded us that we should remand for further proceedings.

■ The Juvenile Act defines a dependent child as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morale . . . ." 42 Pa.C.S.A. § 6302 (1980 pamphlet).[4] Before interfering with a parent's care and control of a child and ordering the intervention of an agency of the state, a court must first determine that the child is dependent. *In re Custody of Frank,* 283 Pa.Super. 229, 423 A.2d 1229 (1980); *In re Jackson,* 267 Pa.Super. 428, 406 A.2d 1116 (1979); *In the Interest of LaRue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976); 42 Pa.C.S.A. § 6341(a). Furthermore, the fact of dependency must be proved by evidence that is "clear and convincing." *In re Custody of Frank, supra; In the Interest of Pernishek,* 268 Pa.Super. 447, 408 A.2d 872 (1979); *In re Jackson, supra; In the Interest of Clouse,* 244 Pa.Super. 396, 368 A.2d 780 (1977); *In the Interest of LaRue, supra;* 42 Pa.C.S.A. § 6341(c). Finally, "[t]he law is clear that a child should be removed from [a] parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this court [has] held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with [the child's] family are not feasible." *In the Interest of*

4. The Juvenile Act provides eight other definitions of a dependent child, but none of these is applicable here.

*K.B.*, 276 Pa.Super. 380, 393, 419 A.2d 508, 515 (1980) (citations omitted). *See also In the Interest of Pernishek, supra*; 42 Pa.C.S.A. § 6301(b)(3) (1980 Pamphlet).

█ Upon considering the lower court's decision in light of these principles, the first difficulty we have encountered is with respect to the court's finding—and the master's finding—that the youngest child, George, is a dependent child. Not only was the evidence of George's dependency not "clear and convincing," there was virtually no evidence at all; the evidence that was presented concerned not George but the parents, Theresa, and Debbra. The lower court determined that George was a dependent child, although he was "too young to evidence the same symptoms as his older sisters," because "the same conditions that have harmed Theresa and Debbra affect George, and the children should not be separated." Slip op. at 3. It is true that a finding of dependency *can* be made on the basis of prognostic evidence. *In the Interest of Black*, 273 Pa.Super. 536, 417 A.2d 1178 (1980) (finding of dependency of newborn infant affirmed where parents' two previous children died because of improper care and precautions taken by the parents); *In the Matter of DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976) (prognostic evidence acceptable but inadequate to support determination of dependency where evidence mainly dealt with inexperience of youthful parents of newborn infant). However, a child should not be found dependent on the basis of little or no evidence simply because his siblings are dependent. *See In the Matter of George*, 272 Pa.Super. 173, 414 A.2d 1063 (1979). A finding that a child is without proper parental care is very serious, for it may color the child's future attitude toward and relationship with his parents. We are particularly concerned here because the lower court removed George from his mother's home and placed him with his father in spite of the fact—noted by the lower court in its opinion but not discussed—that originally, the father denied that he was the father of George.

█ The second difficulty we have encountered with the lower court's decision is with respect to its manner of

considering the evidence. In *In the Interest of Pernishek, supra,* we said:

> To ensure a proper resolution of these issues, separate counsel should represent the child at the dependency hearing, and the hearing judge should conduct a comprehensive inquiry by receiving evidence from both interested and disinterested witnesses and should support his decision in an opinion in which he discusses and analyzes the evidence fully. *In re Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977); *In re Clouse, supra; In re LaRue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976); *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974); *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973).
>
> *Id.,* 268 Pa.Super. at 457, 408 A.2d at 877.

Here, we are unable to say that either the lower court or the master did "discuss[ ] and analyze[ ] the evidence fully."

At the adjudication proceedings before the master testimony was taken from the following people: Richard W. Givan, the master in a previous custody dispute between the parents; Daniel Houlihan, the in-take officer for the juvenile court who detained Theresa on October 15, 1979, when she was brought to the Children & Youth Agency by her father and his attorney; Jeffrey Wolfe, a licensed clinical psychologist who interviewed Theresa, Debbra, and their mother at the request of the Agency; Sergeant Raymond Sample of the Evans City Police Department, a police officer who responded to the father's "911" call on the evening of October 14, made when the father discovered that his wife was not at home to receive Theresa back from her visitation with him; Nancy Ellis, a supervisor for child abuse and general in-take at the Children & Youth Agency; Michele Latagliata, who was Debbra's first-grade teacher and had previously had Theresa as a pupil; Grace Gross, nurse at the children's school; Patricia Zaritski and Nancy Westman, teachers at the School in Beaver County attended by Theresa and Debbra during the three-month period in the spring of 1979 when they lived with their father; the father;

JoAnn Goodman, the woman with whom the father was living; Bill Macurdy, Ms. Goodman's eleven-year-old son; Rose Ann Rummell, the father's sister; Elsie Baxler, the father's mother; Theresa and Debbra; and the mother.

The evidence presented by these witnesses concerned five general areas; the specific incidents of October 14 and 15 that lead to the father taking Thereas to the Children & Youth Agency; the physical conditions in the mother's home; the quality of the mother's care of the children (such as their physical care, her discipline of them, her involvement with their progress in school, and the adequacy of her babysitting arrangements); Theresa's and Debbra's psychological and scholastic development; and the custody dispute between the parents and its impact on the children.

During her testimony, the mother denied most of the testimony concerning the quality of her care of the children. For example: She denied that she had left the children alone in the apartment or with inadequate supervision, N.T. at 246–249, 252. She denied neglecting the children's cleanliness, N.T. at 245–246, or their progress in school, N.T. at 258–259, 261–262. She admitted giving the girls a "licking" but denied "beating" them, pinching them, or ever rubbing their noses in soiled linens as a punishment for bed-wetting. N.T. at 244–245, 249, 251, 267. She denied ever telling the girls what to say at the custody conference or punishing them afterwards for what they said about their father. N.T. at 254–255. She denied that she had ever told Theresa that she should not love her father, N.T. at 251, or told the girls that "bad things would happen" if they saw their father. N.T. at 256. She denied interfering with the children's visitation with their father and asserted that on October 14 it was Theresa who initially did not want to visit with her father. N.T. at 242–243. She denied interrogating the children about what happened during the time they lived with their father. N.T. at 263.

Thus, there were extensive and serious inconsistencies in the testimony received by the master and reviewed by the lower court. However, neither the master nor the lower court resolved the inconsistencies. Substantially no findings

on credibility were made. On subjects of the utmost relevance to a finding of dependency we are therefore without guidance.

Instead of resolving the inconsistencies in the testimony, the lower court based its finding of dependency, and its disposition order, almost exclusively on the evidence that the constant, prolonged, and bitter dispute between the parents had been harmful to the children. In particular, the court said:

> These children have been victimized by the parents. The parents burdened the children with their personal hatreds arising from the marital conflict . . . . The children have been used, and they have been harmed.
>
> Slip op. at 3.

Having examined the record, we have found this finding amply supported. Nevertheless, the problem remains whether the evidence that the parents have "burdened the children with their personal hatreds" is sufficient by itself—*i. e.*, when considered without the inconsistencies in the other evidence having been resolved—to warrant the lower court's finding that the children were dependent. (And here we refer only to Theresa and Debbra, for as noted above, there was virtually no evidence that the parents' conduct had harmed George.)

Jeffrey Wolfe, a licensed clinical psychologist, interviewed Theresa, Debbra and their mother at the request of the Children & Youth Agency. He testified that Theresa was somewhat behind in her overall psychological development, that she had difficulty in her concentration and in her use of imagination, and that was somewhat reluctant to answer questions. N.T. at 51–52. His interpretation was that "she feels exposed to environmental pressures over which she's having trouble getting control, achieving some sense of stability within. There are indicators that there are underlying feelings of anxiousness around her sources of support, emotional nurturance, and there's also indications of underlying depression and hostility." N.T. at 52. He said that she was probably easily influenced by outside opinions. N.T. at 54. Mr. Wolfe testified that Debbra also was somewhat

behind in her psychological development. The most striking thing he noted, however, was "her feeling of real depression .... [S]he also had some trouble with attention and concentration, but these seemed more attributable to depression, than to say with Theresa it was, she was not distractable; she was just very, very depressed." N.T. at 54. He stated that both girls were of average intelligence and that in his opinion, some of the developmental problems were due to their environment. Asked to give his clinical interpretation of the source of the girls' problems, Mr. Wolfe stated that he thought that both suffered from "problems within their early home-life environment," N.T. at 55, the kinds of problems that would not have developed only in the last two years. N.T. at 61. He stated that it was his "feeling that [the problems] were probably going on from a very early age and [were] probably now being exacerbated by some of the conflicts over visitation [and] custody." N.T. at 61. He stated that he thought that both the conflict between the parents and the manner in which the parents have related to the girls were contributing to the girls' problems. N.T. at 73. He also stated that he could not say that either parent was the sole or primary contributor to the girls' problems. N.T. at 55.

The question of the level of parental care required by the Juvenile Act is a difficult one. In *In the Interest of LaRue, supra,* we said:

> On the one hand, the State has an interest in requiring parents to respect the duty they owe their children. [Citation omitted.] On the other hand, in requiring that respect, the State must be cautious not to intrude upon the family to the point of weakening it as one of our most important institutions.

244 Pa.Super. Ct. at 225, 366 A.2d at 1274–1275.

*See also In re Custody of Frank, supra.*

More recently we have said:

> By restricting dependency to the lack of "care or control *necessary* [to a child's] ... health ..." the Act limits the Commonwealth's coercive interference with the family unit to those cases where the parents have not provided "a

minimum standard of care for a child's physical, intellectual and moral well being." *In re Reinker*, 180 Pa.Super. 143, 148, 117 A.2d 780, 783 (1955), cited with approval in *In re DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976). Thus, in determining whether a child is dependent, the hearing judge should not ask what are the child's "best interests" but whether the child is presently without proper parental care and, if so, whether such care is immediately available. *See In re La Rue, supra.* By "proper care" we mean care suited to the child's particular needs. Thus parents may be able to care for a normal child but not one who has special needs. *See In re Whittle*, [263 Pa.Super. 312, 397 A.2d 1225] *supra*, (burns required special therapy which mother was unable to provide); *In re Rinker, supra* (child below average mentally may require more care than a normal child). Accordingly, parental care which is both "necessary" and "proper" is not the best care possible but that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.

*In the Interest of Pernishek, supra,* 268 Pa.Super. 447 at 458, 408 A.2d 872, 877–878.

Applying these principles here, we have no difficulty in concluding that parents owe a special duty to their children when their marriage breaks up. We recognize that it is inevitable that some marriages will prove unhappy and will break up. When that happens, however, the parents are not to use their children as weapons in their struggle against each other. No doubt, even when the parents handle their conflict in a mature and responsible manner, their separation or divorce may be very hard on the children. It is not—and cannot be—the responsibility of the Commonwealth to reach into every home where there is marital conflict in order to supervise and monitor the effects of that conflict on the children. However, when the parents inflict their hatred of each other on the children to such an extent as is likely to cause the children serious psychological damage, the parents have fallen below that minimum level of parental care required by the Juvenile Act, and our concern

to require the parents to live up to their duty to the children outweighs our fear of intruding upon the family.

Having said this much, however, we are unable to say on the basis of the present record that the children have been so harmed as to justify a finding of dependency. Mr. Wolfe's testimony was quite general in nature, and based only on interviews of about an hour with each girl. More particularly, although he found both Theresa and Debbra to be suffering from depression and feelings of hostility, he did not by any means attribute these entirely to the conflict between the parents, instead saying that the girls' problems, while "being exacerbated by some of the conflicts over visitation [and] custody," were probably attributable to "problems within their early home-life environment."

Our final difficulty with the lower court's decision is the disposition order that the children be placed with the father. We recognize that this placement is, under the court's order, subject to the supervision of the Children & Youth Agency. Even so, it remains troubling, given the court's characterization of the father—a characterization supported by the record—which seems to indicate that the court itself was not sure of the wisdom of placing the children with their father. Thus the court said:

> It is not to the credit of George M. [E.] that he delivered his daughter Theresa in a hysterical condition to the Agency. He was at least equally responsible for the depressed mental and emotional condition of Theresa and Debbra. It may be that [he] is a weak, ineffective, unfeeling and incompetent parent. On the other hand he may be a scheming parent who devised a plan to accomplish an objective. There is no evidence that he personally has been a responsible parent, a good parent.
>
> Slip op. at 5.

Accordingly, we shall reverse the lower court's orders finding Theresa, Debbra, and George to be dependent children and shall remand this case to the lower court for a further hearing at which the court can hear more detailed psychological evidence concerning all three children, other evidence concerning both parents' care and attitudes toward

their youngest child George, and evidence concerning the father's care and control of all three children. After receiving such evidence the court should prepare an opinion with specific findings of fact on all the evidence, and enter an appropriate order.

Although the record does not indicate that the lower court's order placing the children with their father was in anyway stayed during this appeal, because of the importance of continuity in the lives of young children we specifically note that our order reversing and remanding is not to be understood as disturbing the present disposition of the children as in the custody of the Children & Youth Agency.

The orders are reversed and the case remanded for further proceedings consistent with this opinion. Any further appeal must be from such new orders as the lower court may enter.

WICKERSHAM, J., files a dissenting statement.

WICKERSHAM, Judge, dissenting:

I would affirm the action taken by President Judge George P. Kiester with care and custody of the children in the hands of Butler County Children and Youth Agency.