NYGAARD, Circuit Judge,
concurring in part, dissenting in part.
I agree with the majority that the May 5, 2006 meeting between Eller and Judge Cascio violated procedural due process, and that the County is liable for this violation. I also agree that caseworkers Eller and Barth are immune from liability on this issue. I write separately because I disagree with the majority on the type of immunity that should be extended to Eller and Barth, and because I differ on the scope of the procedural due process remand.
As to the June 23, 2006 ex parte meeting, I conclude that Eller violated procedural due process, and I would not grant her any immunity on this claim. Nonetheless, I would instruct the District Court to award only nominal damages.
Finally, I agree with the majority that B.S.’s substantive due process claim regarding M.N.’s initial removal from B.S.’s house does not have any merit. However, I reach the same conclusion on all of B.S.’s substantive due process claims. As a result, I do not find any error in the District Court’s grant of summary judgment on these claims.

May 5, 2006 Ex Parte Meeting

Absolute Immunity

In light of our long tradition of reluctance to extend the scope of immunity, I would not adopt the District Court’s broad interpretation of Ernst as to the May 5, 2006 meeting between Jessica Eller and Judge Cascio, applying absolute immunity *277 anytime a court order has been issued, regardless of the context in which the order came about. I agree that a functional analysis is appropriate to assess whether it is proper to extend absolute immunity, but we must take care to provide such immunity only where it is clear that it comports with the larger concerns of procedural due process.
As the Supreme Court said:
Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.
Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). When a child welfare worker functions in the nature of a prosecutor in the context of a judicial process that provides for cross-examination and rebuttal (eliminating the need for collateral litigation to challenge the caseworkers conduct), the full array of considerations appropriate to absolute immunity are addressed. That is the significance, in Ernst, of our grant of absolute immunity to caseworkers in the context of dependency proceedings, a limitation ensuring that the parties and the court have ample opportunities to scrutinize the caseworker’s conduct, decisions and recommendations. Ernst, 108 F.3d at 497; see also Juvenile Act (42 Pa.C.S. § 6324(1)); see also Child Protective Services Act (23 Pa.C.S. § 6315(a)(1)).
For this reason, I cannot accept the majority’s affirmation of the District Court’s formula for providing absolute immunity — essentially applying anytime ■ a court is involved. It provides an over-broad standard that does not comport with fundamental concerns underlying absolute immunity. Although Eller’s and Barth’s conduct and conclusions were placed before a judge in a summary proceeding, their decisions and actions occurred within a process structured to ensure that they were never going to be subjected to cross examination or rebuttal. This is fundamentally at odds with our long-standing concern to extend absolute immunity only where procedural due process is available. Yet, my difficulty with the majority’s conclusion goes far deeper.
The Court of Appeals for the Ninth Circuit said: “[Sjtate law must authorize the prosecutorial or judicial function to which absolute immunity attaches.” Chalkboard, Inc. v. Brandt, 902 F.2d 1375, 1379 (9th Cir.1989). I agree. In Chalkboard, the Court denied absolute immunity to state actors, ruling that the Arizona Department of Health Services was not acting within the “role assigned to it by state law” when it summarily closed a day care center. Id. The majority broadly analogizes Eller’s and Barth’s decisions and actions to those of a prosecutor both because they seem to fall in the category of functioning as a state advocate, and also because Eller interacted with the state court. But, even if we ignore the pro forma and insular nature of the interaction between Eller and Judge Cascio that call the prosecutorial analogy into question, a closer analysis reveals that Eller did not have any statutory authorization to approach the judge to request this particular order.
The starting point for understanding the state’s authority in child welfare cases is the dependency process. “Before interfering with a parent’s care and control of a child and ordering the intervention of an *278 agency of the state, a court must first determine that the child is dependent.” In Interest of Theresa E., 287 Pa.Super. 162, 429 A.2d 1150, 1155 (1981), citing 42 Pa.C.S. § 6341. However, in an emergency, a dependency determination is not necessary.[1] The Child Protective Services Law states the following:
A child may be taken into custody: (1) Pursuant to an order of the court under this chapter. Prior to entering a protective custody order removing a child from the home of the parent, guardian or custodian, the court must determine that to allow the child to remain in the home is contrary to the welfare of the child. (2) Pursuant to the laws of arrest. (3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary. (4) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has run away from his parents, guardian, or other custodian. (5) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has violated conditions of his probation.
42 Pa.C.S. § 6324 (emphasis added). A treating physician or director of a hospital can take a child into protective custody for up to 24 hours if they determine a child to be in immediate danger. 23 Pa.C.S. § 6315(1). After 24 hours, a county agency must get an order to authorize an extension of the protective custody. Id.
Somerset County, Eller and Barth say that they did not take M.N. into protective custody, nor did they ask the court to commence a dependency proceeding to determine the status of the child. Instead, they say, they were merely transferring custody between parents. As they were keen to note throughout their argument, this distinction goes far beyond mere semantics because by seeking this order— unlike a protective custody order — they avoided all hearing requirements.
The Child Protective Services Law states that “[i]n no case shall protective custody under this chapter be maintained longer than 72 hours without an informal hearing under 42 Pa.C.S. § 6332.” 23 Pa. C.S. § 6315. The hearing is held to determine:
whether [the child’s] detention or shelter care is required under section 6325 (relating to detention of child), whether to allow the child to remain in the home would be contrary to the welfare of the child ... [and] [i]f the child is alleged to be a dependent child, the court or master shall also determine whether reasonable efforts were made to prevent such placement or, in the case of an emergency placement where services were not offered and could not have prevented the necessity of placement, whether this level of effort was reasonable due to the emergency nature of the situation, safety considerations and circumstances of the family.
42 Pa.C.S. § 6332. I conclude from this that the state has statutory authority to *279 seek an order removing the child from a parent under two circumstances: following a court’s determination of dependency; and through the mechanism of a protective custody order where the child is in imminent danger of harm. Appellees did neither of the above, removing the child under an order that merely transferred custody between parents. Again, in this case, the difference goes beyond mere semantics, since appellees viewed what they were doing as fundamentally different from the process established in the statutes. This, according to their own argument, is why their conduct did not need to be subjected to the same scrutiny that is dictated in the statutory processes. They were not initiating a dependency process, nor were they seeking a protective custody order. Rather, they were merely initiating a custody process between parents. They were functioning, therefore, in a different capacity. This is where the problem arises.
Pennsylvania law says the following regarding standing to bring custody actions.
The following individuals may file an action under this chapter for any form of physical custody or legal custody: (1) A parent of the child. (2) A person who stands in loco parentis to the child. (3) A grandparent of the child who is not in loco parentis to the child: (i) whose relationship with the child began either with the consent of a parent of the child or under a court order; (ii) who assumes or is willing to assume responsibility for the child; and (iii) when one of the following conditions is met: (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters); (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.
23 Pa.C.S.A. § 5324. The state is not given standing to, sua sponte, initiate court proceedings solely to alter the custody between parents. The problem is that by seeking a custody order rather than a protective custody order, they functioned outside of the statutory structure of the Child Protective Services Law and the Juvenile Act, and more important for immunity analysis, outside of their statutory authority.[2] The state has a broad mandate to protect children from abuse, but it must secure their safety in a manner that is consistent with their statutory authority. To receive the benefits of absolute immunity, child welfare workers, like prosecutors, must act within the confines of their legal authority. By stepping beyond this boundary, even if they were functioning prosecutorially, they crossed a bright line and placed themselves outside of the protective umbrella of absolute immunity.
Therefore, for all of the above reasons, I disagree with the majority and conclude that it is not proper to extend absolute immunity to Eller and Barth for B.S.’s procedural due process claim arising from *280 the May 5, 2006 ex parte meeting.[3]

Qualified Immunity for the May 5, 2006 Meeting

I would, instead, affirm the District Court’s alternative ruling that Eller and Barth should receive qualified immunity. The qualified immunity analysis is focused on the “ ‘objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.’ ” Montanez v. Thompson, 603 F.3d 243, 251 (3d Cir.2010) (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). This “ ‘gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.’ ” Id. (quoting Gilles v. Davis, 427 F.3d 197, 203 (3d Cir.2005)). The analysis is objective, but still requires that we take into account the context in which Eller and Barth acted. Therefore, we must consider a number of factors.
First, Pennsylvania’s legal landscape is somewhat confusing. As I noted above, the Pennsylvania Supreme Court said the following:
[I]t is the duty of the trial court to determine whether the non-custodial parent is capable and willing to render proper parental control prior to adjudicating a child dependent. If the court determines that the custodial parent is unable to provide proper parental care and control “at this moment” and that the noncustodial parent is “immediately available” to provide such care, the child is not dependent under the provisions of the Juvenile Act. Consequently, the court must grant custody of the allegedly dependent child to the noncustodial parent. Once custody is granted to the non-custodial parent, “the care, protection, and wholesome mental and physical development of the child” can occur in a family environment as the purpose of the Juvenile Act directs. 42 Pa.C.S. § 6301(b).
In re M.L., 562 Pa. 646, 757 A.2d 849, 851 (2000) (emphasis added) (quoting In Interest of Justin S., 375 Pa.Super. 88, 543 A.2d 1192, 1200 (1988)). I read this provision as dictating a particular result after a dependency action has been commenced. Yet, fairly read, this holding creates the impression that, in circumstances like that of B.S., a post-deprivation hearing would be, at best, perfunctory.
Second, the County argued that In re M.L. and the Pennsylvania statutes made the dependency process inapplicable to their summary and order procedure.[4] As a result, I query whether there existed a sufficiently confusing environment that would cause a reasonable caseworker to mistakenly conclude that a post-deprivation hearing was not required here. I conclude that this is the case. See O’Brien v. City of Grand Rapids, 23 F.3d 990, 1004 (6th Cir.1994) (“The policy, practice, or custom was taught by a national authority on the management of critical incidents, a person upon whom it was not unreasonable to rely. The officers’ response, which did not vary from the policy, practice, or custom, entitles them to qualified immunity.”). *281 Although the right to a post-deprivation hearing is deeply embedded in our society, we cannot expect caseworkers to parse state supreme court precedent and interpret state law in a way that is contrary to an accepted agency custom. In light of the confusing legal landscape that exists, it was not unreasonable for Barth and Eller to rely upon an established agency custom to guide their handling of the case. For this reason I conclude that the District Court properly determined that Eller and Barth have qualified immunity and are protected from section 1983 liability for the failure to provide B.S. with a post-deprivation hearing.

Remand on Damages for the May 5, 2006 Meeting

I also disagree with the scope of the majority’s remand regarding the County’s liability on the procedural due process violation arising from the May 5, 2006 meeting. I concur with their conclusion that nominal damages are substantiated, but disagree that further damages may be appropriate. The majority concluded that there was a factual dispute about M.N.’s weight on the day that the County removed her from B.S.’s custody. I see no such dispute.
My disagreement with the majority is focused upon a single point of reference in the record: M.N.’s weight on May 5, 2006, the day she was removed from B.S.’s house. There is no dispute that the records specify M.N.’s weight on that day as 22 pounds, 2 ounces. However, Eller, who was present at the medical exam on that day, stated that M.N. was clothed during this weigh-in. No one disputes this, nor do they dispute the fact that prior weights were taken when the child was not clothed.
M.N.’s pediatrician testified only that, in his practice, children were usually weighed without clothes. Yet, he was not present for M.N.’s weigh-in on May 5, 2006 and, significantly, he never challenged Eller’s testimony that, in essence, his protocol was not followed on that occasion. It is axiomatic that, in the absence of any challenge to Eller’s factual statement, B.S. failed to create a factual dispute.
B.S.’s argument, therefore, is that the court would not have ordered M.N.’s removal, or would have immediately returned M.N. to her, if she had been able to present this weight to the court — even though the weight was taken while M.N. was clothed. In light of the Dr. Lindblad’s diagnosis and report,[5] and other information before the court at that time, I do not regard such an inference as reasonable.[6] *282 For this reason, I conclude that there is no basis to send the issue of damages to a jury. I would, instead, remand with instruction for the District Court to award nominal damages.
June 23, 2006 Ex Parte Meeting[7]
As to the June 23, 2006 meeting between Eller and Judge Cascio, I disagree with the majority that there is any basis to extend absolute immunity to Eller on the procedural due process claim. Like the May 5 meeting, even if I agreed that the conduct can be analogized as prosecutorial, Eller had no authority to approach the court to propose another custody order. As a result, there is no basis for absolute immunity.

Qualified Immunity

My disagreement with the majority on the June 23 meeting goes further in that I would not extend even qualified immunity to Eller. As I noted in the discussion of the May 5, 2006 meeting, the constitutional protection against ex parte meetings is well-established. I concluded that qualified immunity was due in that instance, however, because of the combination of a confusing legal landscape and a County custom that misguided the caseworkers actions. Yet, for the June 23, 2006 meeting, there was no applicable County custom. This, to me, is decisive. Eller, acting in discernibly non-emergency circumstances, made the decision to meet ex parte with Judge Cascio on June 23. There is no evidence to suggest that Eller did so at the behest of any County authority, nor was she ordered to do so by the court. Therefore, I must conclude that she acted on her own. Accordingly, there is no basis to conclude that Eller made a reasonable mistake by approaching Judge Cascio ex parte. Nonetheless, as with the May 5, 2006 ex parte meeting, I would award only nominal damages because there is no reasonable basis to infer that the outcome of the meeting would have been different if B.S. had been given the opportunity to confront the evidence.
As with the May 5 meeting, the inquiry on the June 23 meeting focuses on whether B.S.’s inability to confront information provided at the meeting prejudiced the outcome.[8] Yet, as I noted in my analysis of injury arising from B.S.’s other procedural *283 due process claim, I do not find any reasonable basis for the District Court to have inferred that the state court would have made a decision more favorable to B.S. based upon the weight record from the May 5 doctor appointment. The state court’s ignorance of this record was of no moment. The same reasoning applies here.[9]
As to the May 8 weight record, according to Eller, the natural father reported the child was also clothed during this weigh-in. However, even were we to disregard Eller’s undisputed testimony here because she was not physically present at the examination, I note that this weight was taken after M.N. had been in the custody and care of her natural father for three days. As a result, it would not have been reasonable for the District Court to construe this weight record as evidence favorable to B.S.’s claims of constitutional harm, since — objectively—it arose from the period of time in which the natural father, not B.S., had custody of M.N.
We are required to make only reasonable inferences at summary judgment.
Because B.S.’s issues with the CY-48 are predicated on the May 5 and May 8 weights, weights that do not support B.S.’s claims, I must conclude that all of the issues that B.S. raises regarding the report are baseless. Therefore, lacking any reasonable challenge to Eller’s recommendation, there is no evidentiary support for actual prejudice arising from the June 23 meeting between Eller and the state court and, therefore, no evidence of actual, com-pensable, harm. Yet, as with the May 5, 2006 procedural due process violation, I would remand to the District Court with instructions to award nominal damages.
Substantive Due Process Claim[10]
As to the substantive due process claim, I agree with the majority that, as to B.S.’s substantive due process claims arising from M.N.’s removal, no reasonable fact-finder could rule that Eller’s actions shock the conscience. I differ from both of my colleagues, however, in reaching the same conclusion for all of B.S.’s substantive due process claims. I, therefore, do not reach the issue of absolute immunity on this issue.
Eller acted originally upon the report of one of M.N.’s attending physicians, who had sustained contact with both M.N. and B.S. over a period of time. Moreover, the physician’s suspicions of serious neglect arose from observations he made that were grounded in his field of medical expertise. Eller’s subsequent investigation gathered a large amount of data, which provided a. very consistent description of M.N. as one who was severely under *284 weight while under the care of B.S. and who gained weight appropriately while under the care and supervision of others. Finally, while the weight of 22 pounds, 2 ounces is, technically, over the threshold for a failure to thrive diagnosis, the margin by which it exceeds it is extremely slight. Additionally, the weight from May 5 (and the May 8 weight) is a notable outlier when charted with all of M.N.’s recorded weights. This is important in light of Lindblad’s testimony that his assessment arose from long-term patterns that he observed, rather than discrete data points. Viewed in this larger context, even if I could have concluded that Eller mishandled the May 5 or May 8 weight records, her misstatement or misjudgments could hardly be regarded as egregious or conscience shocking.
B.S. attempts to tie all of the alleged errors together by claiming that Eller had an agenda throughout this time to deprive her of custody in favor of the natural father. The problem, however, is that B.S. did not substantiate this theory. She pointed to one possibly uncommon statement in the May 5 order requiring her to refrain from “badgering or harassing the agency staff, belitteling [sic] any service providers or the natural father.” She claims that this is evidence that Eller had a negative view of her. Yet, B.S. fails to produce any evidence from which the District Court could have reasonably inferred such an agenda against her, much less a causal link to the caseworker’s conduct. Without this, her entire substantive due process claim fails.
Accordingly, I do not find any error in the District Court’s decision to grant summary judgment in favor of Eller regarding B.S.’s substantive due process claims.

. The Pennsylvania Superior Court said: "in a dependency proceeding, a court may grant custody of an allegedly dependent child to that child’s non-custodial parent without first declaring the child dependent as long as sufficient evidence of dependency exists.” In Interest of Justin S., 375 Pa.Super. 88, 543 A.2d 1192, 1198 n. 2 (1988). The Pennsylvania Supreme Court went further, stating that "where a non-custodial parent is ready, willing, and able to provide adequate care to a child, a court may not adjudge that child dependent.” In re M.L., 562 Pa. 646, 650, 757 A.2d 849 (2000).

. Pennsylvania courts have been careful to distinguish dependency proceedings from custody actions. "This Court has stated strong disapproval of the use of a dependency proceeding as a means of transferring custody of a child from one parent to another.” In re A.E., 722 A.2d 213, 215 (Pa.Super.Ct.1998); citing Helsel v. Blair County Children and Youth Services, 359 Pa.Super. 487, 519 A.2d 456, 460 (1986); In the Matter of Mark T., 296 Pa.Super. 533, 442 A.2d 1179, 1182 (1982) (Beck, J. concurring).

. This conclusion is further supported by the fact that the caseworkers were not requesting the court to “prosecute” anything: they were not seeking a court declaration regarding the status of the child, nor were they asking the court to adjudicate anything about B.S.’s conduct. Rather, they were merely attempting to unilaterally change the custody arrangement between the parents. Denying absolute immunity here is consistent with our recognition that such immunity requires "meticulous analysis” of a prosecutor’s actions. Odd v. Malone, 538 F.3d 202, 208 (3d Cir.2008).

. I am also aware of the pervasive concern for acting in the best interest of the child.

. At deposition, B.S. presented Dr. Lindblad with a hypothetical in which M.N.’s weight was actually 22 pounds, 2 ounces on May 5. Under this hypothetical, Lindblad stated that, while failure to thrive diagnoses are based upon a trend of data rather than a discreet data point, he would have to take this information into account before deciding on a failure to thrive diagnosis. Yet, as with M.N.’s pediatrician, B.S. never asked Dr. Lindblad to consider the actual data that included the weight of M.N.’s clothes. Lind-blad never commented on the real data. (Interestingly, however, Lindblad detected that the hypothetical was flawed because he stated that such a hypothetical weight would have been highly suspect to him because it diverged so greatly from M.N.'s prior growth.) The majority's use of Lindblad's testimony to suggest that he retracted his diagnosis and ChildLine complaint diverges from fact.

. B.S. fails to raise a dispute of material fact about the fundamental assertion made in El-ler’s summary that she presented to the court: Dr. Lindblad diagnosed M.N. with psychosocial failure to thrive due to chronic low weight gain that, from clinical observation of both M.N. and B. S., likely was caused by B.S.’s conduct. The court's decision to remove M.N. from B.S.’s custody was ultimately based on this observation and diagnosis. Nothing stated in any of the reports of the doctors or caseworker specifically addresses, *282 much less refutes, any of this. Moreover, clarification of Eller’s reference to 19 pounds would not have materially changed anything. This is so because, even if B.S. could have produced credible evidence of a different weight- — the weights taken, for instance, by either of the two physicians who examined M.N. in late April — the evidence would still have supported a conclusion that M.N. was severely underweight while under the care of B.S.

. In a footnote, B.S. generally states that El-ler's decisions "had to have the approval of her supervisor and Agency policy-makers before it could be extended." Yet, as to the June 23, 2006 meeting, B.S. failed to detail any specific challenge to the grant of summary judgment in favor of Barth. I am aware that, under section 1983, “a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff’s rights, directed others to violate them, or, as the personfs] in charge, had knowledge of and acquiesced in [their] subordinates' violations.” AM. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 586 (3d Cir.2004); see also Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir.2010). In this case, however, B.S.'s failure to raise a specific challenge as to Barth waives the issue of the District Court's decision granting qualified immunity to Barth for liability arising from the June 23, 2006 meeting with the court.

. Eller gave the court the summary and proposed order, neither of which provided any details about the investigation. The summary stated only that upon completion of its investigation regarding serious physical neglect, "[t]he CY-48 was filed on June 19, 2006 with *283 Childline and substantiated [B.S.], the natural mother, as the perpetrator.” The proposed order stated only that "due to the indicated report of serious physical neglect whereby B.S. is the perpetrator, it is hereby ordered....” Nonetheless, by the time of the second hearing the County had completed its CY-48 investigation, determining that Lind-blad’s accusation of child neglect by B.S. was “indicated.” B.S. plainly disputes the conclusion of the summary given to the court and disagrees with the custody recommendation, but the focus of her challenge is with information that is contained in or left out of the CY-48. For the sake of summary judgment — since the report was filed before the hearing — I would assume that B.S. had an opportunity to read it and formulate the objections that she voices in this appeal. Moreover, I would presume that her presence at the June 23 meeting would have provided her with a forum to raise numerous issues with the investigation.

. There is no evidence that this record was actually submitted with the CY-48. For purposes of summary judgment, I presume that it was.

. I agree with the majority that that B.S. waived the substantive due process issue as to Barth and the County.