468 A.2d 1098

**In the Matter of the ADOPTION OF Gene Tuney MULLEN.**

**Appeal of Mary Ann Mullen WARD.**

Superior Court of Pennsylvania.

Submitted March 31, 1983.

Filed Oct. 28, 1983.

Reargument Denied Jan. 12, 1984.

Petition for Allowance of Appeal Granted May 21, 1984.

Gary Eiben, Erie, for appellant.

Jeffrey A. Connelly, Erie, for appellee.

William A. Dopierala, Erie, for participating party.

Before CAVANAUGH, BROSKY and MONTGOMERY, JJ.

CAVANAUGH, Judge:

This is an appeal from the final decree of the Orphans' Court Division of the Court of Common Pleas of Erie County terminating the parental rights of appellant Mary Ann Mullen Ward to her natural son Gene Tuney Mullen.[1]

1. The parental rights of the natural father, Gene Tuney Cooner, were terminated by order of the same court; however, he is not a party to

Appellee is Children's Services of Erie County (hereinafter "Children's Services").

The lower court found that grounds for termination existed under three alternate provisions of the *Adoption Act,* specifically 23 Pa.C.S. § 2511(a)(1), (2) and (5). Appellant contends that the evidence is insufficient to establish grounds for involuntary termination under any one of these three statutory provisions.[2] We agree with appellant and reverse.

■ For the purpose of this appeal,[3] we may assume that the proper scope of review in cases of involuntary termination of parental rights is limited to determining whether the decree of the Orphans' Court is supported by competent evidence. *In re L.A.G.,* 490 Pa. 85, 415 A.2d 44 (1980). "The adjudication of the Orphans' Court will not be disturbed if 'the record is free from legal error and ... if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence.' " *In re Burns,* 474 Pa. 615, 624, 379 A.2d 535, 540 (1977) (citations omitted) (quoting *Cohen Will,* 445 Pa. 549, 550, 284 A.2d 754, 755 (1971)). In applying this standard to the instant case, the record discloses the following facts.

Gene was born to appellant on October 28, 1976. Problems first appeared in August of 1978 when, in connection with a special pre-school program, a routine physical examination of the child showed that he had "failed to thrive" and had not received standard immunizations.

this appeal. It should also be noted that appellant has since married her present husband, Ward, and has had one child by that marriage.

2. Because we agree with appellant that the evidence was insufficient to support an involuntary termination, we need not consider her second contention that the lower court erred in terminating her rights on a ground not alleged in the petition.

3. We recognize that the issue of the proper scope of review applied in custody cases is presently before our *en banc* Court in the case of *In re Donna Williams,* 674 Pittsburgh, 1981, argued May 10, 1983; however, the exercise of a different scope of review in this case would not affect the result.

A more serious problem surfaced in September of 1979 when a school nurse noticed a burn injury which had been treated in an unsanitary way. This incident triggered a referral to Children's Services, which investigated the burn and evaluated the home situation. While the burn appeared to have been accidental, the home was found to be disorganized, dirty and roach-infested. It was clear that appellant was having a very difficult time coping with Gene, who was himself diagnosed as hyperactive, with developmental delays and under the best of circumstances a difficult-to-manage child. Appellant was determined to be an individual who was "intellectually limited," with a low threshold for frustration, and whose personal life was in turmoil.[4] All of this combined to create an unworkable situation for raising Gene and after meeting with Children's Services, appellant on September 20, 1979, voluntarily placed him in the care of the agency, which in turn made a foster family placement. After the voluntary placement, there were several supervised visits and meetings with Children's Services until November 30, 1979, when Gene was adjudicated dependent. In conjunction with the dependency adjudication, a schedule of fifteen visits between appellant and her child were established.

During the next ten months, appellant managed to keep eight of the fifteen visits, although Children's Services testified that these were only of limited value because of appellant's continuing inability to control her child's behavior and interact in a constructive way. Also during this period, Children's Services arranged for individual counseling, but appellant failed to follow through on all but one of the sessions. Although appellant has consistently professed her love for and interest in Gene, the record indicates that she frequently allowed other personal problems to interfere with her efforts to reunite with him. On June 12, 1980, appellant was married to her present husband, Ward.

4. During this period, appellant had a series of live-in boy friends who have threatened and physically abused her. Her problems with these men continued until June 1980, when she married her husband, Ward.

On September 30, 1980, the Orphans' Court reviewed its November 30, 1979, dependency adjudication and allowed appellant an additional ninety days to improve her cooperation with Children's Services. During this ninety day period appellant attended three of six scheduled parenting classes, participated in two home visits with Gene and persuaded her reluctant husband to submit to psychological testing and evaluation. Notwithstanding these efforts, on January 12, 1981, Children's Services decided to file a petition to involuntarily terminate appellant's rights, and ended all cooperation with appellant and her efforts to reunite with Gene.[5]

On June 3, 1981, appellant had a child by her husband, and in August of 1981 a new Children's Services case worker was assigned. Although it took a few months for the new caseworker to form a rapport with appellant and her husband, regular visits were ultimately established. At the final hearing on the petition, it appeared through the uncontradicted testimony of this caseworker that appellant, her husband and her then ten-month-old baby had moved to a new apartment and were cooperating fully. The caseworker further testified that the new home was clean and orderly, and that appellant was caring properly for her new baby.

While prior Pennsylvania cases had held that the standard of proof in involuntary termination of parental rights cases was a preponderance of the evidence, the United States Supreme Court recently held that such cases must be proved by clear and convincing evidence.[6] *Santosky v.*

5. For reasons not appearing in the record, this petition was not actually filed until June 17, 1981.

6. The lower court indicated that it was "clearly convinced" that the requirements for termination of appellant's parental rights had been met. Lower court opinion at 7. However, nowhere in the lower court's opinion is there a discussion of this standard or its application to the particular facts of this case. Although it is thus unclear as to the burden of proof applied by the lower court, we need not remand as we have in other cases, *see, e.g., In re: Adoption of N.N.C.*, 315 Pa.Super. 457, 462 A.2d 284 (1983). Rather, since we find that the evidence does not meet even the preponderance standard, we will

*Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Appeal of G.J.A.,* 304 Pa.Super. 21, 450 A.2d 80 (1982). "Clear and convincing evidence is '. . . testimony [that] is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' " *In re Jackson,* 267 Pa.Super. 428, 431, 406 A.2d 1116, 1118 (1979) (quoting *LaRocca Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963)).

■ The first of the three statutory provisions relied upon by the lower court provides that a parent's rights may be terminated if

[t]he parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

This section, thus, contains two alternate grounds for termination: one requiring a "settled purpose" to relinquish parental rights and the other requiring a "refusal or failure" to perform parental duties. *In Interest of T.S.L.,* 487 Pa. 245, 409 A.2d 332 (1979). Although these two grounds are independent, both require a showing of continuous conduct for at least six months. The lower court found such conduct for a period of approximately one and one-half years, from August 13, 1979, to January, 1981. Lower court opinion at 6.

With regard to the first alternative ground, our Supreme Court has said:

[a] "settled purpose" to relinquish parental claims requires a deliberate decision by the parent to terminate the parental relationship, and the parent must persist in that determination throughout the six-month period. Thus, this Court has required an " 'affirmative indication of a positive intent,' " as well as a "finality of purpose," before sustaining a conclusion of a "settled purpose."

reverse without remand. *See In re: Involuntary Termination of Parental Rights to B.L. and J.L.,* 316 Pa.Super. 175, 462 A.2d 851 (1983).

Moreover, any action by the parent within the six-month period inconsistent with such "settled purpose" will preclude an involuntary termination of that parent's rights. *In re Adoption of R.W.B.*, 485 Pa. 168, 174, 401 A.2d 347, 350 (1979) (citations omitted).

The undisputed evidence and finding of the lower court was that appellant consistently proclaimed her interest in Gene throughout the one and one-half year period. Lower court opinion at 6. Thus, contrary to the lower court's conclusion, appellant affirmatively indicated a settled purpose to *retain* her parental rights, rather than a deliberate decision to relinquish them. The evidence, therefore, does not sustain a decree of termination on this ground.

■ With respect to the second ground under § 2511(a)(1), requiring a six month refusal or failure to perform parental duties, the evidence indicates that between August 13, 1979, and November 30, 1979, appellant met with Children's Services, decided to voluntarily place Gene for his own benefit and visited with the child several times. Between November 30, 1979 and September 30, 1980 appellant admittedly missed several visits with Gene and failed to follow through on the counselling program; however, during this period of personal crisis, she did manage eight visits with the child. Between September 30, 1980 and January, 1981, appellant had two home visits with Gene, attended three of six scheduled parenting classes and prevailed upon her husband to submit to psychological testing.

We have often held that:

[p]arenthood is not ... a mere biological status, or passive state of mind which claims and declines to relinquish ownership of the child. It is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern ... [A parent] must exert himself to take and maintain a place of importance in the child's life...

*Appeal of Diane B.*, 456 Pa. 429, 433, 321 A.2d 618, 620 (1974). "Accordingly, when a child has been placed in foster care, a parent has an affirmative duty to work towards the return of the child." *In re William L.*, 477 Pa. 322, 333, 383 A.2d 1228, 1233 (1978), *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).

The record reveals that the appellant originally placed Gene for his own benefit, visited the child throughout the one and one-half year period identified by the lower court and took other substantial steps toward reunion with her son. Furthermore, it is undisputed that appellant is an emotional woman of limited intelligence who was going through a difficult period of personal crisis. Under these circumstances we believe that the lower court erred in finding that appellant had refused or failed to perform her parental duties for a continuous period of six months.[7]

The two other statutory provisions relied upon by the lower court provide that a parent's rights may be terminated if

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the

---

**7.** It may be argued that during the ten month period from November 1980, to September, 1981, there could have been a six month period where there were no visits; however, the lower court does not identify, nor does the record suggest any such specific six month period. The evidence only shows a ten month period, during which there were eight visits.

services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. . 23 Pa.C.S. § 2511(a)(2), (5).

While subsection (a)(2) relates to parental failure or abuse, and subsection (a)(5) relates to voluntary or court ordered removal, both subsections, in substantially similar language, require a finding that the underlying conditions cannot or will not be remedied. *In Interest of C.M.E.,* 301 Pa.Super. 579, 448 A.2d 59 (1982).

■ Children's Services own caseworker testified that appellant and her husband were cooperating well with the agency and were providing a clean and satisfactory home, as well as proper care for their ten-month-old baby, at the time of the final hearing on the petition. This testimony was uncontradicted. Thus, contrary to the lower court's findings, the record shows not only that the underlying conditions of Gene's placement *could* be changed, but to a great extent they *had* been changed. We, therefore, conclude that the record fails to support the lower court's ruling under both subsections 2511(a)(2) and (a)(5).

We find Judge Woodside's observation with regard to the state's power to remove a child from his natural parents, of even greater significance where, as here, the state attempts to finally and permanently sever a natural parent's relationship with his or her child:

A child cannot be declared 'neglected' merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to

the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*Rinker Appeal,* 180 Pa.Super. 143, 148, 117 A.2d 780–783 (1955).

Since we find that none of the statutory provisions relied upon by the lower court are sustained by the record, we reverse.